2013-1583

# United States Court of Appeals
# for the Federal Circuit

———————————————

AGA MEDICAL CORPORATION,

*Plaintiff-Appellant*,

v.

W. L. GORE & ASSOCIATES, INC.,

*Defendant-Appellee*.

———————————————

Appeal from the United States District Court for the District of Minnesota
in case no. 10-CV-3734, Judge Joan N. Ericksen.

———————————————

**BRIEF OF APPELLANT**

———————————————

(*counsel listed on inside cover*)

Gregory G. Garre
Maximilian A. Grant
Matthew J. Moore
Gabriel K. Bell
Latham & Watkins LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004-1304
Tel:  (202) 637-2207
Fax:  (202) 637-2201
Email:  gregory.garre@lw.com

R.J. Zayed
Dorsey & Whitney, LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Tel:  (612) 492-6711
Fax:  (612) 573-6650
Email:  zayed.rj@dorsey.com

Alan G. Carlson
Tara C. Norgard
J. Derek Vandenburgh
Carlson, Caspers, Vandenburgh,
  Lindquist and Schuman, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN  55402
Tel:  (612) 436-9600
Fax:  (612) 436-9605
Email:  acarlson@carlsoncaspers.com
  tnorgard@carlsoncaspers.com
  dvandenburgh@carlsoncaspers.com

Dated: November 21, 2013

*Attorneys for Plaintiff-Appellant*
*AGA Medical Corporation*

## AGA MEDICAL CORPORATION'S CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant AGA Medical Corporation certifies the following:

1.      The full name of every party or amicus curiae represented by me is:

      AGA Medical Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      AGA Medical Corporation

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      AGA Medical Corporation is a wholly owned subsidiary of AGA Medical Holdings, Inc.  AGA Medical Holdings, Inc. is a wholly owned subsidiary of St. Jude Medical, Inc., a public company traded on the NYSE (symbol STJ).

4.      The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

      <u>Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A.</u>:  Dennis C. Bremer, Alan G. Carlson, Jonathan D. Carpenter, Marlee A. Jansen, Samuel T. Lockner, Andrew M. Mason, Tara C. Norgard, J. Derek Vandenburgh;

      <u>Dorsey & Whitney, LLP</u>: R.J. Zayed;

      <u>Latham & Watkins LLP</u>:  Gregory G. Garre, Maximilian A. Grant, Matthew J. Moore, Gabriel K. Bell.

Dated:  November 21, 2013      <u>/s/ J. Derek Vandenburgh          </u>
                                     J. Derek Vandenburgh

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES.................................................. 1

STATEMENT OF JURISDICTION.................................................... 1

STATEMENT OF THE ISSUES......................................................... 1

INTRODUCTION.............................................................................. 3

STATEMENT OF THE CASE............................................................ 4

STATEMENT OF FACTS................................................................... 5

    A.    The Problem Addressed By The Invention.................................... 5

    B.    The Patent-In-Suit............................................................. 9

    C.    Gore's Accused HELEX Device .................................... 13

    D.    District Court Proceedings ............................................ 15

        1.    Claim Construction................................................. 15

        2.    Evidence Of Equivalence Between The Accused
             Device And The Patented Invention.................................... 16

        3.    Summary Judgment of Non-Infringement........................ 19

SUMMARY OF THE ARGUMENT .................................................. 20

ARGUMENT    .................................................................. 22

I.    STANDARD OF REVIEW....................................................... 22

II.    THE DISTRICT COURT ERRONEOUSLY GRANTED
     SUMMARY JUDGMENT BASED ON AN IMPROPER
    CLAIM CONSTRUCTION ...................................................... 23

**A.**    **The Only Structural Feature Necessary To Perform The Recited Securing Function Is The "Threaded Bore"** .......... 24

**B.**    **The District Court Erred In Concluding That The Corresponding Structure Included Unclaimed Features Of The "Clamp"** ........................................................... 28

**III.    SUMMARY JUDGMENT ALSO WAS IMPROPER BECAUSE AGA'S EXPERT TESTIMONY AT LEAST RAISED A GENUINE ISSUE OF DISPUTED FACT** ......................... 30

**A.**    **The Expert Testimony Raised A Prototypical Fact Question**.... 31

**B.**    **The District Court Required Irrelevant Clamp Testimony** ...... 34

**CONCLUSION** .................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*Acromed Corp. v. Sofamor Danek Group, Inc.*,
    253 F.3d 1371 (Fed. Cir. 2001)........................................................ 26, 28, 29, 30

*Al-Site Corp. v. VSI Int'l*,
    174 F.3d 1308 (Fed. Cir. 1999).................................................................. 25, 34

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006).................................................................. passim

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001).................................................................. passim

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
    723 F.3d 1376 (Fed. Cir. 2013)..........................................................................22

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*,
    145 F.3d 1303 (Fed. Cir. 1998)..........................................................20, 23, 26-30

*Cortland Line Co. v. Orvis Co.*,
    203 F.3d 1351 (Fed. Cir. 2000)..........................................................................25

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)..........................................................................25

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998)..........................................................................22

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004)..........................................................20, 24, 27-30

*Hearing Components, Inc. v. Shure Inc.*,
    600 F.3d 1357 (Fed. Cir. 2010).................................................................. 25, 33

*Hughes v. Am. Jawa, Ltd.*,
    529 F.2d 21 (8th Cir. 1976)..............................................................................39

*IMS Tech., Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000)..........................................................22-23, 31-24

*Intellectual Sci. & Tech. v. Sony Elecs. Inc.*,
   589 F.3d 1179 (Fed. Cir. 2009)...........................................................38

*JVW Enters. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005)...........................................................37

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003)...........................................................27

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999)..................................................... 30, 33

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013)..............................................................38

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)..................................................... 31, 32

*W.L. Gore & Assoc., Inc. v. AGA Medical Corp.*,
   No. 12-CV-827 (D. Minn.) ....................................................................1

*Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001)............................................. 26, 28, 30

*Zelinski v. Brunswick Corp.*,
   185 F.3d 1311 (Fed. Cir. 1999)...........................................................38

## RULES

Fed. R. Civ. P. 56 ................................................................................22

## STATUTES

28 U.S.C. § 1295...................................................................................1

28 U.S.C. §§ 1331 and 1338 ................................................................1

35 U.S.C. §112 .................................................................. 15, 23, 24, 33

## OTHER AUTHORITIES

America Invents Act ("AIA"),
   Pub. L. No. 112-29 Stat. 284 (2011)...................................................23

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The following pending case involves the same parties and the same patent, and may be directly affected by the outcome of the present appeal:  *W.L. Gore & Assoc., Inc. v. AGA Medical Corp.*, No. 12-CV-827 (D. Minn.).  Counsel for Plaintiff-Appellant AGA Medical Corporation ("AGA") is unaware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  On July 23, 2013, the district court granted summary judgment of non-infringement to Defendant-Appellee W.L. Gore & Associates, Inc. ("Gore"), and entered final judgment the following day. (A0001; A0011; A0013.)  On August 19, 2013, AGA timely filed a notice of appeal.  (A2978.)  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in construing the "means for securing said device" limitation in the patent at issue to include not just the structural feature of the patented device that actually performs the recited function (the

"threaded bore"), but also an additional, surrounding structural feature (a "clamp," more broadly) that performs an entirely different and ***unclaimed*** function.

2.    Whether, even accepting the district court's claim construction, the district court erred in granting summary judgment of non-infringement to Gore because AGA's expert testimony at least creates a material issue of disputed fact on whether the structure for securing the accused product is equivalent to that disclosed in AGA's patent, such that a jury could find that the accused device meets the "means for securing said device" limitation.

## INTRODUCTION

This case involves an appeal from a grant of summary judgment of non-infringement.  The invention described in the patent-in-suit—U.S. Patent No. 5,944,738 ("the '738 patent")—is a medical device for plugging a hole in an internal wall of a patient's heart.  Plaintiff-Appellant AGA Medical Corp. ("AGA") brought this infringement action against Defendant-Appellee W.L. Gore & Associates, Inc. ("Gore") based on Gore's similar devices.  The district court granted summary judgment of non-infringement to Gore.  However, the court's judgment is grounded on two related, but distinct, errors of law.

First, in construing the claim term "means for securing said device to a delivery system," the district court held that the corresponding structure includes not just the "threaded bore" at the end of the device that performs the recited securing function but also the surrounding structural feature (referred to as a "clamp") that performs an ***additional*** unrelated and unclaimed clamping function. (A0033.)  Under well-established law, when construing a means-plus-function claim limitation, the corresponding structure is limited to the structure necessary to perform the claimed function.  *See*, *e.g.*, *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001).  Corresponding structure does not include additional structural features that perform separate, unclaimed functions.  That settled principle squarely forecloses the district court's construction.

3

Second, even under the district court's erroneous claim construction, AGA's expert provided ample evidence from which a reasonable jury could find that Gore's accused device meets the "means for securing" limitation. He explained in detail why the disclosed device's structure and the accused device's structure perform the same claimed "securing" function in substantially the same way and with substantially the same result, and further testified that skilled practitioners knew that threaded and pop out connections were known to be interchangeable. (*See* A2948-A2956.) This Court has routinely held that such expert testimony is sufficient to raise a material fact question on equivalence, and the expert testimony was sufficient to raise one here. *See*, *e.g*., *Applied Med. Resources Corp. v. U.S. Surgical Corp*., 448 F.3d 1324, 1334-36 (Fed. Cir. 2006). Without faulting the substance of the expert's testimony, the district court rejected it for failing to analyze other (irrelevant) features of the corresponding structure. That was error.

Accordingly, the district court's judgment must be reversed.

## STATEMENT OF THE CASE

In 2010, AGA filed this action against Gore for infringement of the '738 patent in the U.S. District Court for the District of Minnesota. (A0087-88.) On September 28, 2012, the district court issued a claim construction order, in which it construed several terms, including the one which is at issue here: "means for securing said device to a delivery system." (A0029-33.) On July 23, 2013, based

on its claim construction, the district court granted summary judgment of non-infringement to Gore. (A0010.) The district court found that AGA had not presented sufficient evidence to establish a genuine issue of material fact concerning infringement under the court's claim construction—*i.e.*, that AGA failed to present sufficient evidence that the securing means employed by Gore's accused device had a "clamp having a threaded bore" or its equivalent. (A0007.)

This appeal followed.

## STATEMENT OF FACTS

### A.    The Problem Addressed By The Invention

A human heart has two sides separated by an inner wall called the septum. (A0014.) Each side has an upper chamber, an atrium, which collects blood as it flows into the heart and a lower chamber, a ventricle, which pumps blood from the heart to either the lungs or other parts of the body. (*Id.*) The right side of the heart pumps oxygen-depleted blood to the lungs. (*Id.*) The left side of the heart pumps oxygen-rich blood to other parts of the body. (*Id.*)

A septal defect is a hole in the septum. (A0015.) A septal defect allows oxygen-rich blood to mix with oxygen-poor blood. (*Id.*) Septal defects vary in size, shape, and location. (*Id.*) For example, an atrial septal defect ("ASD") is a hole in the septum between the two upper chambers (atria) of the heart. (*Id.*) An ASD allows oxygen-rich blood to flow from the left atrium into the right atrium

instead of the left ventricle.  (*Id.*)  The following graphic compares blood flow in a

normal heart and a heart with an ASD:



(A1449.)

    Prior to the patent-in-suit, devices called "occluders" were developed for

blocking these holes and restoring normal blood flow that could be delivered to the

heart through a catheter to avoid open heart surgery.  (A0222, col.1 l.53 – col.2

l.17.)  Once the occluder reached the heart, the device expanded into two discs—

one on each side of the hole—to close the defect.  (*Id.*)

    The primary occluder type used for closing ASDs in the United States today

is made by AGA and disclosed in AGA's U.S. Patent No. 5,725,552 ("the '552

patent").[1]  (A1416-17.)  Individual wires (made of a metal called Nitinol) are

woven together into a tube of metal fabric:



(A0537, Fig.1A.)  The metal fabric is then heat set to form an occluder with two

disc portions (302 and 304) and a central waist (306), such as that shown in the

following:



(A0551, Fig.17; A0561, col.20 ll.25-34.)  The wires at each end of the metal fabric

tube are clamped together—using clamps (308 and 310 in the above diagram)—to

prevent the wires from coming unwoven (fraying).  (A0561, col.20 ll.1-3.)  The

occluder is compressed into a catheter for delivery to the heart defect where it

returns to its original shape to block the defect.  (A0561, col.20 ll.55-67.)

---

[1]  The '552 patent itself does not qualify as prior art to the patent-in-suit.
However, prototypes of the device shown in the '552 patent were described in
public presentations more than a year before the patent-in-suit was filed.  And the
'552 patent was incorporated in the patent-in-suit.  (A0223, col.3 ll.34-42.)

7

Although these devices were ideal for most ASDs, they were less well-suited for certain other irregularly shaped defects.  (A0222, col.1 l.64-col.2 l.4.)  The short, wide waist portion of the device is relatively rigid, which prevents the two discs from easily moving relative to one another to conform to an irregular hole.  (*Id.*)  One such irregular defect is a "patent foramen ovale" ("PFO"), in which the opening in one side of the septum does not align with the opening in the other side:



(A1415; A1456; *see also* A0223, col.3 ll.1-11.)[2]  For such defects, traditional devices could crush the septal wall (pictured left) or become skewed (pictured right), resulting in leaks:

---

[2] PFOs are normal *in utero* and typically seal closed at birth, but when they fail to do so, they can cause the same problems as other ASDs.



(A2730-31; *see also* A0222, col.1 l.64- col.2 ll.4, 27-28.)

### B.    The Patent-In-Suit

The patent-in-suit—the '738 patent—solves this problem by using a flexible and resilient central waist to create an occluder "capable of automatically adjusting the alignment [of the device] within a septal defect having eccentric openings…." (A0222-23, col.2 l.65-col.3 l.1; *see* A0223, col.3 ll.12-18; A0223, col.4 ll.5-8, 61-66.)  A preferred embodiment is the following:



*Fig.3*    *Fig.7*

(A0218-19, Figs.3&7.)  Like AGA's earlier devices, this device has two discs (12 and 14) that collapse for passage through a catheter and then automatically expand on either side of the septal defect to block it.  (A0227, col.11 ll.23-54.)  However, unlike the earlier devices, the central portion (16) in the device of the '738 patent is able to flex both laterally and in the fore and aft directions to adjust to the specifics of the defect.  (*See*, *e.g*., A0222, col.2 ll.65-67; A0223, col.3 ll.16-18; A0226, col.10 ll.18-20, 39-48; A0219.)

As with AGA's earlier devices, the '738 patent devices are preferably made of woven metal wires.  (A0223, col.3 ll.13-15, 20-23; A0224, col.5 ll.3-14.)  Each end of the wires are clamped, such as by clamps 30 and 32, to hold the wires together and prevent fraying.  (A0226, col.10 ll.21-29; *see also* A0224, col.6 ll.19-22.)  Although the word "clamp" might ordinarily suggest a movable structure that actively grabs onto the structure being clamped (like a pliers or a vice), the clamps 30 and 32 of the '738 patent have no such structure.  Rather, the specification states that the clamp is simply a cylindrical body with a threaded bore (*i.e*., hole) through it:

> In the embodiment shown, the clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another.

10

(A0226, col.10 ll.29-36.)  Thus, a representation of the clamp 32 described in the

patent can be illustrated in cross-section as follows:



The wire strands of the metal fabric are "clamped" simply by inserting them into

one end of the threaded bore.  (*Id.*)  The '738 patent notes that the ability of the

clamps to hold onto the metal fabric may be increased using other known materials

and methods such as welding, soldering, brazing and cementious material.

(A0226, col.10 ll.23-29.)

The '738 patent states that the clamps may also function to secure the device

to the delivery system.  (A0226, col.10 ll.30-32.)  The securing function does not

rely upon any clamping structure or function.  Instead the securing function is

achieved by the threaded bore of the clamp, which is "adapted to receive and

engage a threaded distal end of the delivery device."  (A0226, col.10 ll.36-38; *see*

*also* A0561, col.20 ll.10-14.)

Thus, one end of the clamp structure prevents the metal strands from fraying and the other end of the same structure uses the threaded bore to secure the device to a delivery system. These dual functions can be illustrated as follows:



**Clamp**

**One end of the clamp "clamps" the metal strands together**

**The threaded bore in the other end of the clamp secures to delivery system**

Only two claims (claims 23 and 30) are asserted[3] and both depend from independent claim 20:

> 20.    A collapsible medical device, comprising two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions
>
> wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other,
>
> said device having a proximal end and a distal end,
>
> wherein at least one of the proximal and distal end includes *means for securing said device to a delivery system*,
>
> said device having a collapsed configuration for delivery through a channel in a patient's body.

---

[3] Claims 20, 25, and 27 were also asserted initially, but are no longer at issue.

(A0228, col.13 ll.39-48 (spacing and emphasis added).)  Dependent claims 23 and 30 further require that the flexible central portion be "shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward each other" and "shaped to form a stretchable portion" that adjusts to the thickness of the patient's atrial septum.  (A0228, col.14 ll.8-11 and 41-46.)

### C.    Gore's Accused HELEX Device

Gore's accused HELEX device is made of a wire frame covered with flexible material that, when released from the delivery catheter, form two enlarged discs, as pictured here:



(A1466-68; A1481-2.)  The accused device's central portion flexibly and resiliently adjusts to the shape of PFOs and other complex, eccentric openings.  (A2940-47.)  Gore itself claims that its HELEX device is "soft and flexible" so that it can "conform to the anatomical contours of the septum."  (A1490; A1495; *see also* A1824 (explaining that "[f]lexibility of the central portion allows excellent positioning of the device prior to release").)

The wire frame of the HELEX device is shown below without the covering material:



(A1471.)  The frame has three eyelets—one on each side of the enlarged portions and one in the middle.  (*Id.*)

The HELEX device uses a popout connection to releasably secure the device to the delivery catheter.  (A2949; A2956.)  In particular, each of the three eyelets of the HELEX device forms a bore.  (A2949; A1793.)   The delivery system for the HELEX device includes a mandrel that passes through the eyelet bores.  (*Id.*)  The mandrel is made of a deformable polymer material and is flared at its distal end. (*Id.*)  The flared end of the mandrel mechanically engages the device eyelets to prevent the device from coming off the end of the delivery system during delivery of the device:



(A2953, Fig.30b; *see also* A1793.)  To separate the device from the delivery system, the doctor pulls back on the mandrel, causing the eyelets to pop off the flared end of the mandrel.  (A2949; A1793.)

### D.    District Court Proceedings

#### 1.    Claim Construction

On September 28, 2012, the district court issued an order construing several terms of the '738 patent, including the phrase "means for securing said device to a delivery system" in claim 20.  (A0029-33.)  The parties agreed that this term is a means-plus-function limitation governed by 35 U.S.C. §112, ¶ 6, but disagreed as to both the claimed function and the structure disclosed in the specification for performing that function.  (A00290; A1509; A1751.)

The district court first addressed the claimed function.  AGA argued that the claimed function is "securing the device to a delivery system," just as the claim says.  (A0029.)  Gore proposed a more elaborate construction, arguing: "The function is to maintain a hold on the device to control the manner in which the

device is deployed and to allow the device to be retracted and redeployed." (A0030.)  The district court agreed with AGA, stating: "the claimed function is securing the device to a delivery system."  (A0031.)

The district court then addressed the corresponding structure.  AGA argued that the corresponding structure disclosed in the specification is simply "a threaded bore," while Gore advocated "*a clamp* having a threaded bore."  (A0029-30 (emphasis added).)  The district court adopted Gore's construction.  Although the court acknowledged that the statute prohibits "'incorporation of structure from the written description beyond that necessary to perform the claimed function,'" (A0031 (citation omitted) (emphasis added)), the court did not assess whether any "clamping" feature is necessary to the recited securing function.  (*Id.*)  Instead, the court simply observed that that patent "links or associates a clamp having a threaded bore to the claimed function."  (A0032.)

## 2.    Evidence Of Equivalence Between The Accused Device And The Patented Invention

AGA's technical expert, Dr. Kaushik Bhattacharya, applying the court's definition of the corresponding structure, provided detailed testimony that the accused device's distal eyelet secures the device to the delivery system and is equivalent to the patent-in-suit's "clamp having a threaded bore."  (A2948-56, ¶¶ 56-69.)  Spanning several pages, Dr. Bhattacharya set forth a thorough factual

16

foundation for his conclusions and identified the accused structure through figures and text.  (*Id*.)

Dr. Bhattacharya identified the structural features in both the invention and the accused device that perform the claimed function of securing the device to the delivery system.  (*Id.*)  He explained that the patent's "clamp having a threaded bore" performs that function because the clamp's threaded bore connects to the threaded shaft of the delivery system.  (A2951-53, ¶¶ 62–63 & Fig.13a.)  Likewise, he explained that the accused device's distal eyelet structure performs the same securing function because it is smaller than the flared mandrel of the delivery system.  (A2953 , ¶ 64 & Fig.13b.)

Dr. Bhattacharya explained that one of skill in the art would have viewed the structure of the "clamp having a threaded bore" as equivalent to the accused device's distal eyelet for purposes of "securing the device to the delivery system." (A2954-56, ¶¶ 65-67 & Figs.13a, 13b.)  In addressing the way in which each structure performs the securing function, he described and illustrated that the disclosed device's threaded connection and the accused device's pop out connection both work by relying on mechanical interference of opposing surfaces (labeled "a" in each of the following figures):

 

**Securing structure of '738 patent**    **Securing structure of accused device**

(*Id.* at A2955-56, ¶¶ 65-66 & Figs.13a, 13b.)  The result in each is a connection
that secures the device to the delivery system until the operator separates them.
(A2956, ¶ 67.)

Further, Dr. Bhattacharya testified that threaded connection systems and pop
out connection systems such as these were known in the art to be interchangeable.
(A2956, ¶ 68.)  He supported his opinion with a specific citation to a prior art
implantable device that was connected to its delivery catheter via a pop out
connection.  (*Id.*; *see also* A0510, Ex.11d.)  And he analogized the patent-in-suit's
securing means to a screw-off bottle cap and the accused device's securing means
to a pop-off bottle cap—features well-known to be interchangeable.  (A2956, ¶
68.)  He concluded that "[t]he interchangeability is virtually as simple as the
interchangeability of a nail and a screw, particularly when taken in the context of
the invention."  (*Id.*)

### 3.     Summary Judgment of Non-Infringement

Gore moved for summary judgment of non-infringement, arguing that the accused device does not have a clamp or the equivalent of a clamp.  (A1849.)  The district court granted Gore's motion.  (A0007-08.)  The district court did not fault Dr. Bhattacharya's analysis or conclusion that the pop out connection of the accused device is equivalent to the threaded connection disclosed in the '738 patent for performing the claimed function of securing the device to a delivery system.  Nor did the district court hold that, based on this testimony, a reasonable jury could not find such equivalence.  Instead, the district court rejected Dr. Bhattacharya's testimony for allegedly failing to apply the court's claim construction by failing to analyze whether the accused device has the equivalent of a "clamp" having a threaded bore.  (A0006-09.)  The district court further held that Dr. Bhattacharya's opinion that the distal eyelet of the accused device was equivalent to the "clamp with a threaded bore" was "conclusory" because the "clamp" aspect was not discussed in describing the way in which the corresponding structure functioned.  (A0008.)   Thus, the district court found that AGA failed to raise a material fact question and granted summary judgment of non-infringement.  (A0009.)

## SUMMARY OF THE ARGUMENT

The district court's judgment of non-infringement is grounded on the court's conclusion that the corresponding structure of the recited securing means is not just the "threaded bore" that is used to perform the claimed function (i.e., securing the device to the delivery system), but also the entire "clamp," which performs the separate—and unclaimed—function of preventing the metal ends from fraying. That misunderstanding pervades both the court's claim construction and its infringement analysis—and it contravenes established precedent of this Court.

First, the district court's claim construction contravened the settled rule that "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Asyst Techs.*, 268 F.3d at 1370; *see also*, *e.g.*, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334 (Fed. Cir. 2004). The structure called a "clamp" in the '738 patent—of which the threaded bore is a part—performs two discrete functions: one end of it performs the claimed function of securing the device to the delivery system using the threaded bore, and the other end performs the ***unclaimed*** function of clamping the metal fabric wires forming the preferred device itself. In construing the claim to require a "clamp," the district court erroneously defined the corresponding structure in ways unrelated to the recited

20

function by including the part of the clamp that ties the metal strands together to prevent them from fraying—an additional and ***unclaimed*** function.  That erroneous claim construction, which underlies the district court's subsequent grant of summary judgment, requires reversal.

Second, even under the district court's erroneous claim construction, AGA presented sufficient evidence to prevent summary judgment of non-infringement. AGA's expert, applying the district court's claim construction, gave detailed testimony explaining and illustrating how the securing structure of the accused device is equivalent to the securing structure described in the '738 patent.  He explained that the way the "clamp with a threaded bore" secured the patented device to the delivery system was by using a threaded bore and that the way the accused device was secured to the delivery system was in a manner that was equivalent to a threaded bore.  This Court has repeatedly held that such evidence is sufficient to preclude summary judgment.  *See*, *e.g*., *Applied Med. Resources*, 448 F.3d at 1334-36.  Particularly given the fact that the claimed securing means in the '738 patent is not even a critical or novel element of the invention, a reasonable jury could find infringement based on Dr. Bhattacharya's testimony.

The district court did not disagree with the substance of AGA's expert testimony, but nonetheless rejected it because it focused on the way in which the corresponding structure performs the claimed function (*i.e.*, using a threaded bore

to secure the device) rather than on how it performs other unclaimed "clamping" functions. But this Court squarely rejected the district court's approach in *Applied Medical Resources*, holding that the equivalence inquiry **must** "be restricted to the way in which the structure performs the **properly-defined function**" and "not be influenced by the manner in which the structure performs **other, extraneous** functions." 448 F.3d at 1334 (second emphasis added). The district court contravened that settled rule here.

For either (or both) of these reasons, the judgment of non-infringement should be reversed and the case remanded for further proceedings.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1378 (Fed. Cir. 2013). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Claim construction is also reviewed *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Summary judgment of non-infringement is proper only if, viewing the evidence and drawing all reasonable

inferences in favor of AGA, a reasonable jury could not find infringement. *IMS Tech.*, 206 F.3d at 1429.

## II.    THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT BASED ON AN IMPROPER CLAIM CONSTRUCTION

Section 112, paragraph 6 of the Patent Act permits a patentee to recite a claim element as a means or step for performing a function without reciting the structure for performing that function. 35 U.S.C. § 112, ¶ 6 (2011).[4] Such a claim element is "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.*

Construction of a means-plus-function limitation requires a court to identify two things. First, the court must identify the function recited by the limitation. *Asyst Techs.*, 268 F.3d at 1369. Second, the court must identify the "corresponding structure" disclosed in the specification for performing ***that particular function***. *Id.* The statute "does not 'permit incorporation of structure from the written description beyond that ***necessary*** to perform the claimed function.'" *Id.* at 1369-70 (citation omitted) (emphasis added). Indeed, "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Id.*; *see also*, *e.g.*, *Chiuminatta Concrete*

---

[4] This is now known as § 112(f) due to the America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), although there were no substantive changes. Because the '738 patent was filed before the AIA's September 16, 2012 effective date, this suit is controlled by the pre-AIA version of § 112.

*Concepts*, 145 F.3d at 1308-09; *Golight*, 355 F.3d at 1334.  That settled principle compels the conclusion that the district court's claim construction is erroneous.

### A.    The Only Structural Feature Necessary To Perform The Recited Securing Function Is The "Threaded Bore"

Here, the asserted claims describe a medical device with a "means for securing said device to a delivery system." (A0228, col.13 ll.45-46.)  It is undisputed that this term is a means-plus-function limitation governed by 35 U.S.C. §112, ¶ 6 and by this Court's two-step framework for construing such limitations (as described above).

Under the first step of that framework, the function performed by the securing means is "securing the device to a delivery system," as AGA proposed and the district court correctly held.  (A0031.)  That is the only function recited in the claim term at issue here.  (A0228, col.13 ll.39-48.)

Under the second step, the corresponding structure that performs ***that securing function*** is a "threaded bore" on the end of the medical device that the delivery system screws into.  The specification explains that the "threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device." (A0226, col.10 ll.36-38.)  And the specification teaches that "[o]nce the medical device is properly positioned … the [delivery device] can be rotated about its axis to unscrew the medical device from the threaded distal end of the [delivery device]."  (A0225, col.8 ll.58-63.)  Although the "threaded bore" is the center of

24

the "cylindrical" feature that is identified in the patent as a "clamp" (A0226, col.10 ll.33-34), the "threaded bore" is also identified as a discrete structural feature (34). (*See* A0219-20, Figs.7, 8, 10; A0226, col.10 ll.36-38.)

The specification does not identify any other structural feature as "***necessary*** to perform the claimed function" of securing the medical device to the delivery system. *Asyst Techs.*, 268 F.3d at 1370 (emphasis added). Therefore, under the settled rule for construing means-plus-function limitations, the "threaded bore" is the corresponding structure and a court may not incorporate any additional "structural aspects" or "features," including the clamp more broadly (of which the "threaded bore" is a part). *Id.* at 1370-71; *see*, *e.g.*, *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1354-55, 1357 (Fed. Cir. 2000) (corresponding structure for "connecting" means includes only the specific "threaded connectors," not the additional superfluous features of the surrounding components).[5]

---

[5] *See also Hearing Components, Inc. v. Shure Inc*., 600 F.3d 1357, 1370 (Fed. Cir. 2010) ("attaching or fastening means" undisputedly corresponds to "screw threads, a ball-and-socket attachment, a layer of adhesive, and their equivalents"); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1308 (Fed. Cir. 2005) (corresponding structure is "nut with internal threads cooperating with the external threads of the anchor seat," not other aspects of the "anchor seat"); *Al-Site Corp. v. VSI Int'l*, 174 F.3d 1308, 1315 (Fed. Cir. 1999) ("fastening means" undisputedly corresponds to "either a rivet or a button and hole arrangement" or their equivalents).

This Court has consistently prohibited courts from importing as limitations structural features that perform functions ***other than*** the recited function as "corresponding structure." For example, in *Chiuminatta Concrete Concepts*, the claimed invention was directed to a concrete saw that has a means for supporting the surface of the concrete—a function performed in the specification by a "skid plate." 145 F.3d at 1305-06, 1308. But the Court held that not ***all*** disclosed structural aspects of the skid plate are "corresponding structure" because the specification includes details—such as certain physical characteristics to reduce wobbling and support the weight of the saw—that are "unrelated to the recited function." *Id.* at 1308. Such "additional structural aspects," the Court held, "are not what the statute contemplates as structure corresponding to the recited function." *Id.*

Similarly, in *Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225 (Fed. Cir. 2001), although the district court correctly identified "circulating air" as the recited function, it "improperly restricted the 'air circulation means' limitation to structure that was disclosed in the preferred embodiment, but was not necessary to perform the recited function." *Id.* at 1233. This Court faulted the district court for including structural features "capable of performing the unrecited" and "separate" function of *re*circulating air. *Id.* at 1234-35. Likewise, in *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371 (Fed. Cir. 2001),

the Court held that the corresponding structure included only the features (*i.e.*, *some* of the structural features of one of the three "segments" of the bone screw at issue) that perform the claimed functions of preventing leaks and restricting transverse movement, not other "unnecessary" features (such as one segment being wider than the threads).  *Id.* at 1376-77, 1382.

And, again, in *Golight*, this Court held that, although an "assembly" performed the claimed function of "rotating [a] lamp unit in a horizontal direction," not every structural facet of the "assembly" is corresponding structure. 355 F.3d at 1334.  The Court explained that, although the assembly "contains particular structures for permitting rotation through 360°, such as the follower pin 64 and slot 65," those features "are **superfluous** to [the] claim construction analysis because they are not **required** for performing the claimed function."  *Id.* (emphasis added).  *See also*, *e.g.*, *Asyst Techs.*, 268 F.3d at 1370-71 (corresponding structure excludes preferred embodiment's cable component because it does not perform the "receiving and processing" data function recited in the claims); *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) (corresponding structure excludes "[f]eatures [of the pictured embodiment] that do not perform the recited function").

That principle controls the outcome here.  Just like the "unrelated" structural "aspects" of the skid plate in *Chiuminatta Concrete Concepts*, the "separate" and

27

"unrecited" recirculating air features in *Wenger*, the "unnecessary" characteristics of the screw threads in *Acromed*, and the "superfluous" rotational features in *Golight*, the structural part of the clamp disclosed in the '738 patent that performs the unclaimed "clamping" function of tying down the ends of the metal fabric of the preferred embodiment is *not* "corresponding structure" because it does *not* perform the recited securing function.

**B.    The District Court Erred In Concluding That The Corresponding Structure Included Unclaimed Features Of The "Clamp"**

The district court acknowledged that it is impermissible to import structural features into the construction "beyond that necessary to perform the claimed function." (A0030-31.) But the court failed to apply that well-established principle. The court simply stated that the specification "links" a "clamp having a threaded bore" to the securing function, catalogued examples from the specification, and, without further analysis, concluded that the corresponding structure is a "clamp having a threaded bore." (A0032-33.) The court never specifically assessed which structural elements were ***necessary*** to perform the claimed securing function and never separated out any superfluous elements. In other words, the court never performed the critical step required by the *Chiuminatta Concrete Concepts* line of cases. (*See supra* at 25-27.) As those cases make clear, it is not enough to identify a broader structure described or illustrated in the specification and label it the "corresponding structure," even if the

28

broader structure is "linked" in some sense to the component part that actually performs the recited function. *See*, *e.g.*, *Chiuminatta Concrete Concepts*, 145 F.3d at 1308 (excluding certain features of disclosed "skid plate"); *Acromed Corp.*, 253 F.3d at 1382 (same, bone screw "segment"); *Golight*, 355 F.3d at 1334 (same, rotational "assembly").

By defining the corresponding structure as a "clamp with a threaded bore," the district court erroneously included unnecessary structural features in the means-plus-function limitation—features beyond those necessary to perform the recited function of securing the device to a delivery system. As discussed, the structure that the patent calls a "clamp" performs two independent functions: (1) one end holds together (or "clamps") the ends of the metal fabric of the preferred embodiment; and (2) the other end secures (via the threaded bore) the medical device to the delivery system. (A0226, col. 10 ll. 21-38.) Critically, however, only the securing function is recited in the asserted claims. And the only structural aspect of the clamp that is ***necessary*** to perform that function is the "threaded bore." (*See* A0226, col. 10 ll. 36-38 ("The threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery system.").) Thus, under settled law, the "corresponding structure" is only the "threaded bore" and the district court erred by including the "clamp" feature more broadly. *See*

*Chiuminatta Concrete Concepts*, 145 F.3d at 1308; *Wenger*, 239 F.3d at 1233-35;

*Acromed Corp.*, 253 F.3d at 1382; *Golight*, 355 F.3d at 1334.

Based on its erroneous construction of the "means for securing" as

corresponding to "a clamp having a threaded bore," the district court held that

AGA failed to raise a genuine issue of material fact. (A0007.) Therefore, this

Court should correct the claim construction, hold that the corresponding structure

is the "threaded bore" that performs the recited function, and reverse the district

court's summary judgment of non-infringement.

## III.  SUMMARY JUDGMENT ALSO WAS IMPROPER BECAUSE AGA'S EXPERT TESTIMONY AT LEAST RAISED A GENUINE ISSUE OF DISPUTED FACT

An accused product literally infringes a means-plus-function limitation if the

relevant structure in the accused product performs the identical function recited in

the claim "in substantially the same way, with substantially the same result" as the

corresponding structure in the specification. *Applied Med. Resources*, 448 F.3d at

1333; *see also Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir.

1999). In assessing whether the structures perform the function in the same way,

"the inquiry should be restricted to the way in which the structure performs the

***properly-defined function*** and should not be influence by the manner in which the

structure performs other, ***extraneous*** functions." *Applied Med. Resources*, 448

F.3d at 1334 (second emphasis added). Further, evidence of known

interchangeability can demonstrate equivalence. *IMS Tech.*, 206 F.3d at 1435.

Also, the context of the invention must be considered: if "the disclosed physical

structure is of little or no importance to the claimed invention," then equivalence is

easier to show. *Id.* at 1436; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

1292, 1304 (Fed. Cir. 2011).   Under these principles, even accepting the district

court's erroneous claim construction, the testimony of AGA's expert, Dr.

Bhattacharya, raised a genuine fact question precluding summary judgment.

### A.     The Expert Testimony Raised A Prototypical Fact Question

AGA's expert, Dr. Bhattacharya, provided ample evidence from which a

reasonable jury could conclude that the accused devices have the "means for

securing" limitation.  (A2948-56.)  Applying the district court's claim construction,

he testified that the accused device's eyelet is equivalent to the "clamp having a

threaded bore" for the purpose of performing the claimed function.  (A2951, ¶ 61;

A2956, ¶ 69.)  As Dr. Bhattacharya described (and illustrated), both devices

perform the securing function by relying on mechanical interference between

surfaces of the components: the disclosed device's threaded bore at the end of the

clamp creates a threaded connection with the delivery system just as the accused

device's eyelet creates a pop out connection with the delivery system.  (A2951-55,

¶¶ 60-66 & Figs.13a, 13b.)  And he explained that the result in each is the same: a

connection secures the device to the delivery system until the operator separates

them.  (A2956, ¶ 67.)  Also, Dr. Bhattacharya testified that skilled practitioners knew that threaded and pop out connections were interchangeable ways to connect an implantable medical device to its delivery catheter.  (*Id.* at ¶ 68.)  He specifically pointed to a prior art implantable device that was connected to its delivery catheter via a pop out connection.  (*Id.*; *see also* A0510, Ex. 11d.)  And he analogized to the choice between a screw-off cap or a pop-off cap for closing a soda bottle.  (A2956, ¶ 68.)  Accordingly, Dr. Bhattacharya's testimony was appropriately "restricted to the way in which the structure performs the ***properly-defined function***"—the securing function—and was not "influence[d] by the manner in which the structure performs other, ***extraneous*** functions"—such as an unclaimed "clamping" function.  *Applied Med. Resources*, 448 F.3d at 1334 (second emphasis added).

Moreover, the disclosed device's threaded connection for securing it to the delivery system is undisputedly not the inventive aspect of the device—indeed, it was well-known.  (*See*, *e.g.*, A2175 ("A threaded connection has been known for decades.").)  Instead, the patent-in-suit's novel aspect lies in its ability to automatically adjust to irregular septal openings by virtue of a flexible and resilient central portion.  (*See* A0222, col.2 ll.63-67; A0223, col.3 ll.13-18; *supra* at 9-13.)  That makes it even easier to show equivalence here.  *See Uniloc USA*, 632 F.3d at 1304; *IMS Tech.*, 206 F.3d at 1436.

Thus, especially in the context of this invention, there is ample evidence—which must be accepted as true for purposes of summary judgment—from which a reasonable jury can find equivalence. *See, e.g.*, *Applied Med. Resources*, 448 F.3d at 1335-36 (vacating summary judgment of non-infringement because expert testimony was sufficient to raise a genuine dispute of material fact as to equivalence under § 112, ¶ 6); *Asyst Techs.*, 268 F.3d at 1373-74 (same); *Odetics*, 185 F.3d at 1270 (expert testimony about similarities in devices' use of mechanical "force" is sufficient for jury to find equivalence under § 112, ¶ 6).

Indeed, this Court has previously found in like circumstances that precisely such evidence is sufficient to show equivalence for similar means of attaching, fastening, or securing. For example, in *Hearing Components*, the claims required a means for "attaching" or "fastening" two components together and the corresponding structures were screw threads, a ball-and-socket attachment, or a layer of adhesive. 600 F.3d at 1361-63. This Court held that the accused device's straight nozzle could be equivalent to those structures because both rely on friction to keep the components together. *Id.* at 1363-64. The Court found a material fact question based on an expert's testimony that the accused device's "straight nozzle is not sigificantly different" from "a screw head" and other evidence of known interchangeability. *Id.* at 1370-71.

Likewise, in *IMS Tech*, the Court found a material fact question based on evidence of structural similarities and known interchangeability, in a case where the "physical characteristics" of the disputed means limitation were not "important to the invention." 206 F.3d at 1437. The Court further explained that if a claim element is a "means for securing parts A and B together" and, "[f]or purposes of the invention, it does not matter how parts A and B are secured," then although "[a] screw is not a nail, … it is equivalent structure in the context of the invention." *Id.* at 1436 n.3. And in *Al-Site*, this Court held that the plaintiff's expert testimony on the equivalence of two fastening methods was sufficient evidence to support a jury's verdict of infringement, where the jury found the "fastening means" term satisfied even though the corresponding structure was a rivet or button and hole arrangement and the accused device used glue. 174 F.3d at 1316.

As in those cases, AGA's expert testimonial evidence of equivalence between the securing structures, including evidence of known interchangeability, is sufficient to allow a reasonable jury to find infringement. Thus, AGA has raised a material fact question on equivalence and summary judgment was improper.

## B.    The District Court Required Irrelevant Clamp Testimony

In granting summary judgment, the court did not disagree with the details of Dr. Bhattacharya's testimony relating to the equivalency of the way the threaded bore performed the securing function compared to the way the Gore device

34

performed that function.  The court nonetheless rejected Dr. Bhattacharya's testimony out of hand, concluding that (1) he failed to apply the court's claim construction—because his report purportedly focused on the "threaded bore" instead of the "clamp having a threaded bore"—and (2) his opinion was "otherwise conclusory."  (A0007-08.)  The district court was wrong on both counts.

First, Dr. Bhattacharya *did* apply the district court's claim construction.  He made clear that his "analysis is based on … the specific constructions adopted by the [district court]," including the construction that, for the securing means, "[t]he corresponding structure is 'a clamp having a threaded bore.'"  (A2932-33, ¶¶ 26, 28.)  And Dr. Bhattacharya did, in fact, direct his analysis to the "clamp having a threaded bore."  (A2951, ¶ 61; A2956, ¶ 69; *see also* A2951, ¶ 62 (discussing the "device … shown in the patent"); A2952 Fig.13a (displaying "the device with a threaded bore").)  He determined that, for the purpose of performing the claimed function, the accused device's eyelet is equivalent to the "clamp having a threaded bore."  (A2951, ¶ 61; A2956, ¶ 69.)  In reaching that conclusion, Dr. Bhattacharya's analysis correctly focused on *how* each corresponding structure performs the securing function—and in the disclosed device that is via the mechanical interference created by the clamp's threaded bore.  (A2951-56.)  *See Applied Med. Resources*, 448 F.3d at 1334.

Nonetheless, the district court discarded Dr. Bhattacharya's testimony because it did not discuss the structure or function of the ***clamp*** part of the "clamp with a threaded bore," a structural feature that performs an ***unclaimed*** function entirely different than the recited function.  (A0008-09.)  But this Court rejected that approach in *Applied Medical Resources*, holding that only "the way in which the structure performs the ***properly-defined function***" is relevant to the equivalence inquiry, not "the manner in which the structure performs other, extraneous functions."  448 F.3d at 1334.  In that case, this Court rejected the district court's infringement analysis because it "improperly imported unclaimed functions when analyzing the way in which the disclosed embodiment performed the claimed function."  *Id.* at 1334-35.

The district court made precisely the same error here, by rejecting Dr. Bhattacharya's testimony for failing to focus more on the "clamp" as a whole, even though the only "clamping" that it performs (holding the metal ends of the preferred embodiment together) is unrelated to performing the securing function. While the district court was looking for references to the "clamp," there simply was no reason for Dr. Bhattacharya to reference the clamp in describing the way the device operated to perform the recited function except to acknowledge that the "clamp with a threaded bore" was the corresponding structure.  The body of the expert's analysis had few references to a clamp because, under *Applied Medical*

*Resources*, the clamping feature (whether structure or function) is irrelevant to the securing function. *Id*; *see also JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333-34 (Fed. Cir. 2005).

The district court was improperly influenced by the "clamp" moniker. But equivalence turns on what the disclosed structure that performs the claimed function *is*, not what the structure is *called*. Regardless of whether the structure disclosed and described in the '738 patent is called a clamp, a fitting, a connector, a housing, or something else, the structure is simply a "cylindrical" body with a "threaded bore" (or hole) extending through it. (A0226, col.10 ll.29-38.) One end of the cylinder screws onto the delivery system (thus performing the claimed securing function), while the other end receives the strands of the metal fabric (thus performing an unclaimed clamping function). (*See supra* at 10-12.) The structure is the same at each end. (*Id.*) And Dr. Bhattacharya conducted his equivalence analysis based on this structure, focusing on how one end interacts with the threaded shaft to perform the claimed securing function. Thus, regardless of the words used to describe the corresponding structure, Dr. Bhattacharya analyzed the structure that the district court called a "clamp having a threaded bore." Dr. Bhattacharya appropriately applied the claim construction and the district court erred in rejecting his testimony.

Second, Dr. Bhattacharya's opinion that the accused device's distal eyelet is equivalent to the "clamp with a threaded bore" is well-supported—and not "otherwise conclusory." The district court characterized Dr. Bhattacharya's opinion" as conclusory because Dr. Bhattacharya did not reference the clamp in explaining why the distal eyelet was equivalent to the "clamp with a threaded bore." (A0009.) Again, Dr. Bhattacharya properly followed *Applied Medical Resources*, and there was no reason to reference the clamp performing a function different than the recited function.

Expert testimony on equivalence can be insufficient to raise a material fact question if it lacks the "necessary evidentiary basis" and is "devoid of facts upon which the conclusions were reached," *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) (citation omitted), provides only "a conclusion supported by no explanation or reasoning," *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. 2013), or fails to "pinpoint" the structures in the accused device that performed the claimed function, *Intellectual Sci. & Tech. v. Sony Elecs. Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009). Dr. Bhattacharya's testimony suffers from none of these flaws. His report provides a thorough factual foundation (including detailed descriptions of how the devices operate), his analysis and reasoning spans seven pages (carefully explaining how he found equivalence), and he "pinpoints" the specific structure (the eyelet) in the accused device that

performs the securing feature.  (A2948-56, ¶¶ 56-69.)  The report is by no means the "type of 'intangible speculation' that would justify the ordering of summary judgment against the plaintiff."  *Hughes v. Am. Jawa, Ltd.*, 529 F.2d 21, 25 (8th Cir. 1976).  Based on Dr. Bhattacharya's evidence, a reasonable jury could conclude that the securing means of the accused HELEX device is equivalent to that disclosed in the '738 patent.  Therefore, the district court erred in granting summary judgment of non-infringement.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings.

Date: November 21, 2013                    Respectfully Submitted,


Gregory G. Garre                           /s/ J. Derek Vandenburgh
Maximilian A. Grant                        Alan G. Carlson
Matthew J. Moore                           Tara C. Norgard
Gabriel K. Bell                            J. Derek Vandenburgh
Latham & Watkins LLP                       Carlson, Caspers, Vandenburgh,
555 Eleventh St. NW, Suite 1000              Lindquist and Schuman, P.A.
Washington, DC 20004-1304                  225 South Sixth Street, Suite 4200
Tel:  (202) 637-2207                       Minneapolis, MN  55402
Fax:  (202) 637-2201                       Tel:  (612) 436-9600
Email:  gregory.garre@lw.com               Fax:  (612) 436-9605
                                           Email: acarlson@carlsoncaspers.com
R.J. Zayed                                 tnorgard@carlsoncaspers.com
Dorsey & Whitney, LLP                      dvandenburgh@carlsoncaspers.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Tel:  (612) 492-6711
Fax:  (612) 573-6650
Email:  zayed.rj@dorsey.com


*Attorneys for Plaintiff-Appellant*
*AGA Medical Corporation*

# ADDENDUM

**ADDENDUM**

**TABLE OF CONTENTS**

Memorandum on Summary Judgment dated 7/23/13.....................................A0001

Order on Summary Judgment dated 7/23/13…………………………………A0011

Final Judgment dated 7/24/13…………………………………………………...A0013

Order on Claim Construction dated 9/28/12…………………………………….A0014

U.S. Patent No. 5,944,738……………………………………………….....A0217

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AGA Medical Corp.,

Plaintiff,

v.

W. L. Gore & Associates, Inc.,

Defendant.

Civil No. 10-3734 (JNE/JSM)
MEMORANDUM
**(FILED UNDER SEAL)**

---

Alan G. Carlson, J. Derek Vandenburgh, Tara C. Norgard, Samuel T. Lockner, and Jonathan D. Carpenter, Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A., appeared for Plaintiff AGA Medical Corp.

James W. Poradek, Kevin P. Wagner, Nina Y. Wang, Jared B. Briant, and Leslie B. Prill, Faegre Baker Daniels LLP, appeared for Defendant W. L. Gore & Associates, Inc.

---

AGA Medical Corp. (AGA) brought this action against W. L. Gore & Associates, Inc. (Gore), for patent infringement. Gore asserted counterclaims for declarations of noninfringement and invalidity. The patent in suit is U.S. Patent No. 5,944,738 (filed Feb. 6, 1998). Several motions are before the Court: (1) Gore's Motion for Summary Judgment; (2) Gore's Motion to Exclude the Expert Report and Opinions of Dr. Timothy J. Nantell; (3) AGA's Motion for Partial Summary Judgment; (4) AGA's Motion to Exclude Testimony Regarding Manipulations of ASO Devices by Dr. Alex Javois and Dr. Robert Gorman; and (5) AGA's Motion to Exclude Certain Testimony Offered by Mr. Donald A. Gorowsky. For the reasons set forth below, the Court grants Gore's Motion for Summary Judgment and denies the other motions.

1

## I.     BACKGROUND

A human heart has two sides separated by an inner wall, the septum.  Each side has an upper chamber, an atrium, that collects blood as it flows into the heart and a lower chamber, a ventricle, that pumps blood from the heart to either the lungs or other parts of the body.  The right side of the heart pumps oxygen-depleted blood to the lungs.  The left side of the heart pumps oxygen-rich blood to other parts of the body.

A septal defect is a hole in the septum.  Septal defects vary in size, shape, and location.  A septal defect allows oxygen-rich blood to mix with oxygen-poor blood.  For example, an atrial septal defect is a hole in the part of the septum that separates the atria.  An atrial septal defect allows oxygen-rich blood to flow from the left atrium into the right atrium instead of the left ventricle.  Consequently, oxygen-rich blood is pumped back to the lungs instead of other parts of the body.  Another septal defect, known as a patent foramen ovale, is a flap or valve-like opening in the part of the septum that separates the atria.  It allows blood to flow in either direction between the atria.

According to the '738 Patent's Background of the Invention, "the present invention relates to a low profile occlusion device for non-surgical treatment of a patient having a Patent Foramen Ovale . . . and resulting paradoxical cerebral emboli.  The device made in accordance with the invention is capable of automatically adjusting to a septal defect having eccentric openings and is particularly well suited for delivery through a catheter or the like to a remote location in a patient's heart or in an analogous vessel or organ within a patient's body." '738 Patent, col.1, ll.8-17.  The '738 Patent contains thirty claims.  Three are independent: claims 1, 13, and 20.

2

**A0002**

Initially, AGA Medical asserted claims 20, 23, 25, 27, and 30 against Gore. After bringing this action, AGA executed a covenant not to sue Gore for infringement of claims 20, 25, and 27.[1] Claims 20, 23, and 30 appear below.

> **20.** A collapsible medical device, comprising two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device having a proximal end and a distal end, wherein at least one of the proximal and distal end includes means for securing said device to a delivery system, said device having a collapsed configuration for delivery through a channel in a patient's body.

> **23.** The device as recited in claim **20**, wherein said flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

> **30.** The medical device as recited in claim **20**, wherein the flexible central portion is shaped to form a stretchable portion, wherein the flexible central portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in a preset configuration.

The accused device is Gore's HELEX Septal Occluder. An expert retained by AGA's counsel described the HELEX Septal Occluder as follows: it is "made of a single nitinol wire frame"; "the wire is formed in the shape of an oblong spiral of relatively small diameter to form the 'proximal eyelet' or the 'right atrial eyelet'"; "subsequently, the wire winding expands into a larger diameter portion that forms the 'right atrial disc' or the 'right disc'"; "then, the wire is formed into a second oblong spiral of small diameter or the 'center eyelet'"; "the wire winding then expands again to a second enlarged diameter portion that is the 'left atrial disc' or the 'left disc'"; "following that the wire continues into a third oblong spiral of small diameter that forms the 'distal eyelet' or the 'left atrial eyelet'"; "the wire loops back and passes through the distal eyelet, center eyelet and the proximal eyelet"; and "the wire emerges on the proximal side where

---

[1]    AGA executed two covenants not to sue. The first covered the "GORE® HELEX Septal Occluder device." The second covered both the "GORE® HELEX Septal Occluder device and the Gore® Septal Occluder device."

3

it is formed into a 'lock loop'." The HELEX Septal Occluder "has an expanded

polytetrafluoroethylene . . . fabric bonded to the nitinol wire frame to form patches."

## II.   DISCUSSION

The Court begins with Gore's Motion for Summary Judgment. Summary judgment is

proper "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an

assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of

materials in the record," show "that the materials cited do not establish the absence or presence

of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited

materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In

determining whether summary judgment is appropriate, a court must look at the record and any

inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Gore moves for summary judgment of noninfringement. According to Gore, the HELEX

Septal Occluder does not meet the "means for securing said device to a delivery system"

limitation of the asserted claims.

"Literal infringement of a claim limitation in means-plus-function format 'requires that

the relevant structure in the accused device perform the identical function recited in the claim

and be identical or equivalent to the corresponding structure in the specification.'" *Welker*

*Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099 (Fed. Cir. 2008) (quoting *Applied Med. Res.*

*Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006)); *see Odetics, Inc. v. Storage*

*Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). "A structure in the accused device

4

constitutes an equivalent to the corresponding structure in the patent only if the accused structure performs the identical function 'in substantially the same way, with substantially the same result.'" *Gen. Protecht Grp., Inc. v. Int'l Trade Comm'n*, 619 F.3d 1303, 1312 (Fed. Cir. 2010) (quoting *Applied Med. Res.*, 448 F.3d at 1333)); *see Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013). "Whether an accused device or method infringes a claim with a § 112, ¶ 6 limitation, i.e., whether it performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, is a question of fact." *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429-30 (Fed. Cir. 2000).

In an Order dated September 28, 2012, the Court concluded that "means for securing said device to a delivery system" is a means-plus-function limitation whose claimed function is securing the device to a delivery system and that the corresponding structure is a clamp having a threaded bore. *See Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012); *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011); *cf. Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.'").

According to Gore, AGA failed to offer evidence that the HELEX Septal Occluder has a structure that is identical or equivalent to a clamp having a threaded bore. Instead, Gore argues, AGA offered evidence that the HELEX Septal Occluder has a structure that is equivalent to a threaded bore. AGA responds that the HELEX Septal Occluder has a structure that is equivalent to a clamp having a threaded bore. AGA maintains that "the proper infringement analysis involves an examination of only that part of the structure of the 'clamp having a threaded bore' that is necessary to perform the claimed function of 'securing the device to the delivery system.'"

5

AGA asserts that its expert identified the structure in the HELEX Septal Occluder "that is the **equivalent** of the 'clamp having a threaded bore' for purposes of performing the claimed function of 'securing the device to the delivery system.'"

According to AGA's expert, "[t]he HELEX® device is secured to the delivery system by the left atrial (or distal) eyelet mating with the flared mandrel of the delivery system. . . . The distal eyelet interferes with the mandrel flare, thereby securing the HELEX® device to the delivery system." (Citation omitted.) The expert stated that "the distal eyelet is on the distal end of the HELEX® device," that "the distal eyelet performs the function of 'securing the device to the delivery system' by engaging against the flare of the mandrel in the delivery system," and that "the distal eyelet of the HELEX® device is equivalent to the 'clamp having a threaded bore' structure shown in the '738 patent for performing the function of 'securing the device to the delivery system.'" The expert continued by describing how the device and delivery system of the '738 Patent function:

> 63.    The device's threaded bore consists of threads machined into a hole (bore) and *the threaded bore serves as the means for securing the device to the delivery system*. The threads in the bore mechanically engage the thread on the shaft of the delivery system. The smallest diameter of the device's threaded bore has a smaller diameter than the largest diameter at the top of the treads [sic] in the delivery system. This provides a mechanical interference between the annular surfaces . . . of the delivery system threads and the bore threads and prevents the delivery system from passing freely through the threaded bore. Further, this attachment is designed to be removable: rotating the shaft of the delivery system with respect to the threaded bore causes the shaft threads to slide out of the bore thereby removing the mechanical interference.

(Emphasis added.) The expert then discussed the HELEX Septal Occluder:

> 64.    The distal eyelet of the HELEX® device performs *the same function of securing the device to the delivery system as the threaded bore shown in the '738 patent*. In the Gore system, the diameter of the opening in the distal eyelet is smaller than the outer dimension of the flared enlarged portion of the mandrel. This provides a mechanical interface between the annular surfaces . . . of the eyelet and the flared enlarged portion and prevents the delivery system from passing freely through the eyelet.

6

**A0006**

65.     This arrangement provides a mechanical interference and it is designed to be removable: pulling the mandrel made of a plastic material causes the flare to deform thereby removing the mechanical interference.

(Emphasis added.)  A comparison of the HELEX Septal Occluder to the '738 Patent's device

followed:

66.     The distal eyelet of the HELEX® device performs *the same function of securing the device to the delivery system as the threaded bore shown in the '738 patent* in substantially the same way to accomplish substantially the same result. . . . [T]he way both systems operate is to use mechanical interference between a face of each of the delivery system and the device to hold the delivery system to the device.

67.     The result is the same for both systems because the mechanical interference secures the device to the delivery system until the operator desires to separate them by twisting the shaft out of the bore in the structure shown in the patent or by popping the flared mandrel out of the eyelet in the Gore device.  Any differences between the two systems are insubstantial particularly taken in the context of the invention and/or the skill of people in the art.

68.     Furthermore, persons of ordinary skill in this art would have known of the interchangeability of the screw out system shown in the '738 patent and the pop out system used by Gore.

(Emphasis added.)  The expert concluded:

69.     In summary, it is my opinion that the distal eyelet is on the distal end of the HELEX® device, and the distal eyelet is equivalent to the structure "clamp having a threaded bore" for purposes of performing the function of "securing the device to the delivery system", and performs that identical function.

The expert's opinion that the distal eyelet of the HELEX Septal Occluder "is equivalent

to the structure 'clamp having a threaded bore' for purposes of performing the function of

'securing the device to the delivery system'" does not raise a genuine issue of material fact on

the issue of infringement.  The expert's opinion rests on an analysis that did not apply the

Court's claim construction.  *See Intellectual Science & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d

1179, 1183 (Fed. Cir. 2009) (stating that "a patentee's expert must set forth the factual

foundation for his infringement opinion in sufficient detail for the court to be certain that features

7

of the accused product would support a finding of infringement under the claim construction adopted by the court"); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."); *Wiener v. NEC Elecs., Inc.*, 102 F.3d 534, 542 (Fed. Cir. 1996) ("Because Mr. Eklund's statements [about equivalency] rest on an incorrect claim interpretation, however, they do not create a factual dispute."), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). The opinion is otherwise conclusory. *See Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("[A]n expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact. A party may not avoid that rule by simply framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device." (citation omitted)); *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny motions for summary judgment."). As noted above, "means for securing said device to a delivery system" is a means-plus-function limitation whose claimed function is securing the device to a delivery system. The corresponding structure is a clamp having a threaded bore. AGA's expert analyzed the issue of equivalency as if the Court had concluded that the corresponding structure was simply a threaded bore. To the extent AGA argues that the Court should ignore a portion of the "clamp having a threaded bore," the Court rejects AGA's argument:

> The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function. This is why structures with different numbers of parts may still be equivalent under § 112, ¶ 6, thereby

8

meeting the claim limitation. The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which "corresponds" to the claimed function. Further deconstruction or parsing is incorrect.

*Odetics*, 185 F.3d at 1268 (citations omitted) (explaining that *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303 (Fed. Cir. 1998), does not support component-by-component analysis of equivalence). The assertions of AGA's expert about interchangeability do not obviate the need for a comparison to a clamp having a threaded bore. *See Chiuminatta*, 145 F.3d at 1309-10 ("[A] finding of known interchangeability, while an important factor in determining equivalence, is certainly not dispositive. Such evidence does not obviate the statutory mandate to compare the accused structure to the corresponding structure." (citation omitted)). AGA has not directed the Court to any evidence that raises a genuine issue of material fact as to whether the HELEX Septal Occluder has either a clamp having a threaded bore or the equivalent of a clamp having a threaded bore.[2] Consequently, the Court grants Gore's motion.

---

[2]    Highlighting the use of "threaded connection" in a report written by an expert retained by Gore's counsel, AGA asserted that Gore's expert analyzed equivalence in the same manner as AGA's expert: "At all times, [Gore's expert] referred to the threaded bore part of the overall 'clamp' structure. At no point, did he ever refer to or consider the clamp part of the overall 'clamp' structure." The Court rejects AGA's argument. Gore's expert stated:

A clamp having a threaded bore is the only structure identified in the '738 Patent for securing the devices described therein to the delivery system. The '738 Patent also describes a threaded guide wire delivery system that mates with the threaded clamp. Essentially, this is a nut-and-bolt type of connection. It involves two very specific threaded structures—the clamp having a threaded bore and the guide wire having threads on its exterior surface—that are designed to mate together, much like a specific nut is designed to mate with a specific bolt. Of the myriad of possibilities available to them, the inventors only described a nut-and-bolt type of threaded connection as the means for securing their device to a delivery system. And of that nut-and-bolt type of connection, only the clamp having a threaded bore that is part of the device is actually claimed in the Asserted Claims.

All threaded connections provide very strong attachment between the two structures being attached, and that principle holds true for the '738 Patent as well. . . .

9

**A0009**

Summary judgment of noninfringement on claims 23 and 30 and AGA's covenant not to sue Gore for infringement of claims 20, 25, and 27 dispose of AGA's infringement claim. Having resolved AGA's infringement claim, the Court dismisses without prejudice Gore's counterclaims for declarations of noninfringement and invalidity. *See Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1370-71 (Fed. Cir. 2004); *Nystrom v. TREX Co.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003). The remaining motions raise issues of invalidity and damages. The Court denies as moot the remaining motions.

### III.    CONCLUSION

In short, the Court grants Gore's Motion for Summary Judgment, denies the remaining motions, dismisses with prejudice AGA's Complaint, and dismisses without prejudice Gore's counterclaims. The Court will issue a separate order that is consistent with this Memorandum.

Dated: July 23, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

. . . .

In addition to allowing the operator to control the device during deployment, the threaded connection also allows the operator to retract the device back into the delivery catheter and to redeploy the device. For example, if the operator of a device described in the '738 Patent decides he needs to reposition the device after it has exited the catheter, the clamp having a threaded bore engaged with the threaded guide wire allows the operator to pull the device back into the catheter without damaging the device.

(Footnotes omitted.)

10

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AGA Medical Corp.,

       Plaintiff,

v.                                          Civil No. 10-3734 (JNE/JSM)
                                          ORDER

W. L. Gore & Associates, Inc.,

       Defendant.

---

Alan G. Carlson, J. Derek Vandenburgh, Tara C. Norgard, Samuel T. Lockner, and Jonathan D. Carpenter, Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A., appeared for Plaintiff AGA Medical Corp.

James W. Poradek, Kevin P. Wagner, Nina Y. Wang, Jared B. Briant, and Leslie B. Prill, Faegre Baker Daniels LLP, appeared for Defendant W. L. Gore & Associates, Inc.

---

      AGA Medical Corp. (AGA) brought this action against W. L. Gore & Associates, Inc.

(Gore), for patent infringement. Gore asserted counterclaims for declarations of

noninfringement and invalidity. The patent in suit is U.S. Patent No. 5,944,738 (filed Feb. 6,

1998). Several motions are before the Court: (1) Gore's Motion for Summary Judgment;

(2) Gore's Motion to Exclude the Expert Report and Opinions of Dr. Timothy J. Nantell; (3)

AGA's Motion for Partial Summary Judgment; (4) AGA's Motion to Exclude Testimony

Regarding Manipulations of ASO Devices by Dr. Alex Javois and Dr. Robert Gorman; and (5)

AGA's Motion to Exclude Certain Testimony Offered by Mr. Donald A. Gorowsky. On July 23,

2013, the Court filed under seal a Memorandum. For the reasons set forth in the Memorandum,

the Court grants Gore's Motion for Summary Judgment, denies the other motions, dismisses with

prejudice AGA's Complaint, and dismisses without prejudice Gore's counterclaims.

A0011

Unless the Court orders otherwise, the Court will either unseal the Memorandum or file a redacted version of the Memorandum no later than August 2, 2013. The parties shall submit proposed redactions, if any, to the Memorandum on or before July 31, 2013.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.    AGA's Motion to Exclude Testimony Regarding Manipulations of ASO Devices by Dr. Alex Javois and Dr. Robert Gorman [Docket No. 343] is DENIED.

2.    AGA's Motion for Partial Summary Judgment [Docket No. 348] is DENIED.

3.    Gore's Motion to Exclude the Expert Report and Opinions of Dr. Timothy J. Nantell [Docket No. 353] is DENIED.

4.    AGA's Motion to Exclude Certain Testimony Offered by Mr. Donald A. Gorowsky [Docket No. 357] is DENIED.

5.    Gore's Motion for Summary Judgment [Docket No. 365] is GRANTED.

6.    AGA's Complaint is DISMISSED WITH PREJUDICE.

7.    Gore's counterclaims are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 23, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

AGA Medical Corp.,

        Plaintiff,

**JUDGMENT IN A CIVIL CASE**

V.

Case Number:   10-cv-03734-JNE-JSM

W.L. Gore & Associates, Inc.,

        Defendant,

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1.  AGA's Motion to Exclude Testimony Regarding Manipulations of ASO Devices by Dr. Alex Javois and Dr. Robert Gorman [Docket No. 343] is DENIED.
2.  AGA's Motion for Partial Summary Judgment [Docket No. 348] is DENIED.
3.  Gore's Motion to Exclude the Expert Report and Opinions of Dr. Timothy J. Nantell [Docket No. 353] is DENIED.
4.  AGA's Motion to Exclude Certain Testimony Offered by Mr. Donald A. Gorowsky [Docket No. 357] is DENIED.
5.  Gore's Motion for Summary Judgment [Docket No. 365] is GRANTED.
6.  AGA's Complaint is DISMISSED WITH PREJUDICE.
7.  Gore's counterclaims are DISMISSED WITHOUT PREJUDICE.

July 24, 2013

Date

RICHARD D. SLETTEN, CLERK

s/Gina Wooton

(By)        Gina Wooton   Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AGA Medical Corp.,

        Plaintiff,

v.                                 Civil No. 10-3734 (JNE/JSM)
                                  ORDER

W. L. Gore & Associates, Inc.,

        Defendant.

---

J. Derek Vandenburgh, Alan G. Carlson, R.J. Zayed, Tara C. Norgard, and Samuel T. Lockner, Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A., appeared for Plaintiff AGA Medical Corp.

Matthew Blackburn, Zachary Silbersher, and Jennifer Kenedy, Locke Lord LLP, and James Poradek, Faegre Baker Daniels LLP, appeared for Defendant W. L. Gore & Associates, Inc.

---

AGA Medical Corp. brought this action against W. L. Gore & Associates, Inc., for patent infringement. W. L. Gore asserted counterclaims for declarations of noninfringement and invalidity. The patent-in-suit is U.S. Patent No. 5,944,738 (filed Feb. 6, 1998). The case is before the Court to construe disputed terms pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

## I.     BACKGROUND

A human heart has two sides separated by an inner wall, the septum. Each side has an upper chamber, an atrium, that collects blood as it flows into the heart and a lower chamber, a ventricle, that pumps blood from the heart to either the lungs or other parts of the body. The right side of the heart pumps oxygen-depleted blood to the lungs. The left side of the heart pumps oxygen-rich blood to other parts of the body.

A0014

A septal defect is a hole in the septum. Septal defects vary in size, shape, and location. A septal defect allows oxygen-rich blood to mix with oxygen-poor blood. For example, an atrial septal defect is a hole in the part of the septum that separates the atria. An atrial septal defect allows oxygen-rich blood to flow from the left atrium into the right atrium instead of the left ventricle. Consequently, oxygen-rich blood is pumped back to the lungs instead of other parts of the body. Another septal defect, known as a patent foramen ovale, is a flap or valve-like opening in the part of the septum that separates the atria. It allows blood to flow in either direction between the atria.

According to the '738 Patent's Background of the Invention, "the present invention relates to a low profile occlusion device for non-surgical treatment of a patient having a Patent Foramen Ovale . . . and resulting paradoxical cerebral emboli. The device made in accordance with the invention is capable of automatically adjusting to a septal defect having eccentric openings and is particularly well suited for delivery through a catheter or the like to a remote location in a patient's heart or in an analogous vessel or organ within a patient's body." '738 Patent, col.1, ll.8-17. The '738 Patent contains thirty claims. Three are independent: claims 1, 13, and 20. AGA Medical asserts that W. L. Gore infringed claims 20, 23, 25, 27, and 30. The asserted claims appear below. Disputed limitations are emphasized.

> **20.** A collapsible medical device, comprising two enlarged diameter portions and *a **flexible central portion interconnecting the two enlarged diameter portions*** wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device having a proximal end and a distal end, wherein at least one of the proximal and distal end includes ***means for securing said device to a delivery system***, said device having a collapsed configuration for delivery through a channel in a patient's body.

> **23.** The device as recited in claim **20**, wherein said flexible central portion is shaped to form a ***resilient*** portion to thereby pull the two enlarged diameter portions toward the other.

2

A0015

**25.** The device as recited in claim **20**, wherein a *separation distance between the two enlarged diameter portions* is less than *a thickness of a patient's atrial septum*.

**27.** The medical device as recited in claim **20**, wherein said means for securing includes *means for attachment to a delivery device*.

**30.** The medical device as recited in claim **20**, wherein the flexible central portion is shaped to form a stretchable portion, wherein the flexible central portion stretches to adjust to *a thickness of a patient's atrial septum* while the two enlarged diameter portions remain in a preset configuration.

## II.    DISCUSSION

The construction of patent claims "is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). Words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the pertinent art at the time of the invention. *Id.* at 1312-13. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, a court should look to the sources available to the public that show what a person of skill in the art would have understood the claim language to mean. *Id.* at 1314. "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The claims provide substantial guidance as to the meaning of particular claim terms. *Id.* In some cases, the use of a term within the claim provides a firm basis for construing the term. *Id.* Other claims of the patent can be valuable sources of enlightenment as to the meaning of a claim term. *Id.* "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* In addition, differences between claims can help determine the meaning of particular claim terms. *Id.* For example, a dependent claim that adds a particular limitation creates a presumption that the limitation is not present in the independent claim. *Id.* at 1314-15.

The claims do not stand alone, however, and "must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal quotation marks omitted). The specification is "always highly relevant" to claim construction and usually is dispositive because it is "the single best guide to the meaning of a disputed term." *Id.* (internal quotation marks omitted).

In addition to the claims and specification, a court should consider the patent's prosecution history, if it is in evidence. *Id.* at 1317. The prosecution history can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Finally, a court may consider extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation marks omitted). Extrinsic evidence, however, is less significant than the intrinsic record in claim construction. *Id.* Dictionaries and treatises can be useful in claim construction. *Id.* at 1318. Dictionaries, particularly technical dictionaries, "endeavor to collect the accepted meanings of terms used in various fields of science and

technology." *Id.* Expert testimony may aid a court in a variety of ways: by providing background on the relevant technology; by explaining how an invention works; and by ensuring that a court's understanding of technical concepts and terms is consistent with that of a person of ordinary skill in the art. *Id.* Expert testimony that consists of conclusory, unsupported assertions as to the definition of a claim term is not useful, however, and "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Id.* (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

**A.      A flexible central portion interconnecting the two enlarged diameter portions**

Claim 20 recites "a flexible central portion interconnecting the two enlarged diameter portions." AGA asserted that "[n]o construction is necessary" and that "[t]his claim term does not require a metal fabric." W. L. Gore offered this construction: "[a] flexible metal fabric portion that is located between and links together the two enlarged diameter portions." According to the Joint Claim Construction Statement, "[t]he parties agree that the central portion does not include either enlarged diameter portion, which is intended only to ensure that neither party can claim the exact same section of the medical device as being part of both the central portion and the enlarged diameter portions."

*Metal fabric*

The language of the '738 Patent's claims does not support W. L. Gore's assertion that the flexible central portion should be limited to a metal fabric. Whereas other claims explicitly recite "metal fabric," claim 20 does not. For instance, claim 1 recites:

> A collapsible medical device, comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end, each end having means for securing the metal fabric attached thereto, thereby inhibiting

5

**A0018**

unraveling of the metal fabric, said metal fabric having a relaxed configuration having two enlarged diameter portions and a central portion disposed between the two enlarged diameter portions wherein said central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device further having a collapsed configuration for delivery through a channel in a patient's body.

Claim 13 recites:

A collapsible medical device, comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end, each end having means for securing the metal fabric attached thereto, thereby inhibiting unraveling of the metal fabric, said metal fabric having a relaxed configuration having two enlarged diameter portions and a resilient portion disposed between the two enlarged diameter portions wherein said resilient portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device further having a collapsed configuration for delivery through a channel in a patient's body.

Claim 21 states: "The device as recited in claim **20**, wherein said device is formed from a metal fabric consisting of a plurality of woven metal strands."  Although claims 1, 13, and 21 are directed to devices formed from or comprising a metal fabric, nothing about the disputed limitation in claim 20 indicates that the flexible central portion should be limited to a metal fabric.  Were claim 20 to require a metal fabric, claims 20 and 21 would be indistinguishable.[1] *Cf. InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, No. 2010-1093, 2012 WL 3104597, at *5 (Fed. Cir. Aug. 1, 2012) ("The doctrine of claim differentiation is at its strongest in this type of case, where the limitation that is sought to be read into an independent claim already appears in a dependent claim." (internal quotation marks omitted)); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1275 (Fed. Cir. 2012) ("The doctrine of claim

---

[1]     In its responsive memorandum, W. L. Gore asserted that "AGA's claim differentiation argument fails because claims 20 and 21 are different."  W. L. Gore explained:  "Claim 21 requires that the ***entire device*** is formed from metal fabric 'consisting of a plurality of woven metal strands,' but under Gore's proposed construction claim 20 would only require a metal fabric ***central portion***.  This difference alone overcomes the doctrine of claim differentiation."  At the claim construction hearing, W. L. Gore asserted that the entire device, except for clamps, has to be a metal fabric.

differentiation, while not a hard and fast rule of construction, creates a presumption that the independent method claims do not contain this limitation, for the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." (internal quotation marks omitted)).

W. L. Gore relied heavily on the specification and the prosecution history to support its argument that the flexible central portion requires a metal fabric.[2] The specification addresses at length formation of the devices from a metal fabric, but the Court does not discern in it an indication that the flexible central portion must be limited to a metal fabric. *See Phillips*, 415 F.3d at 1316. The same is true of the prosecution history. Initially, claims 1 and 13 recited "a tubular metal fabric," claim 20 did not mention a metal fabric, and claim 21 recited "a continuous tubular metal fabric." The examiner rejected all claims "under the judicially created doctrine of double patenting":

> The subject matter claimed in the instant application is fully disclosed in the patent [U.S. Patent No. 5,725,552] and is covered by the patent since the patent and the application are claiming common subject matter, as follows: A collapsible medical device comprises a continuous tubular metal fabric having a plurality of woven metal strands and means for securing each end of the metal strands, wherein the metal fabric has a configuration which includes two enlarged diameter portions and a reduced central portion.

The examiner also rejected all claims as anticipated by U.S. Patent No. 5,733,294 (Forber):

> In figures 6-8 and column 5, lines 54-67, Forber . . . discloses a collapsible device having a tubular metal fabric which includes woven metal strands 122, wherein the metal fabric has ends with means 123 to secure thereof so as to prevent unraveling of the metal fabric, wherein the metal fabric has a relaxed configuration which possesses first and second enlarged diameter portions and an elastic central portion, as recited in claims 1, 8, 13, 20-21.

Thus, the examiner assumed that claim 20 required a tubular metal fabric.

---

[2]    According to W. L. Gore, "if claim 20 does not require a metal fabric central portion, then it is invalid for lack of written description and enablement." The Court expresses no opinion on this assertion.

7

In response to the examiner's rejection, the applicant amended claims 1 and 13 by deleting "tubular" from the description of the metal fabric. The applicant also indicated that claim 1's central portion, as well as claim 13's resilient portion, allows lateral movement of each of the two enlarged diameter portions with respect to the other. In claim 20, the applicant added "flexible" to the description of the central portion and indicated that the flexible central portion allows lateral movement of each of the two enlarged diameter portions with respect to the other. The applicant deleted "continuous tubular" from the description of the metal fabric in claim 21. In remarks explaining how the claims as amended were distinguishable from Forber and the '552 Patent, the applicant essentially repeated claims 1, 13, and 20, as amended. Thus, the applicant noted that claim 1 was "directed to a collapsible medical device comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end," that claim 13 was "directed to a collapsible medical device comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end," and that claim 20 was "directed to a collapsible medical device comprising two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions." The applicant continued:

> Neither the '294 patent nor the '552 patent show or describe a collapsible medical device having a central portion that allows lateral movement of each of the two enlarged diameter portions with respect to the other. At best, the "central portion" of the '294 patent and/or the '552 patent allow the "enlarged diameter portions" to rotate around the "central portion" and with respect to each other. There is no suggestion and it does not appear that the "central portion" of either the '552 patent or the '294 patent would or could allow lateral movement of the "enlarged diameter portions" with respect to each other.

> It appears that the office action has incorrectly assumed that the center portion of the '294 and '552 devices are flexible or resilient. The teaching of the '294 patent does not describe the central portion of the metal fabric as being flexible or resilient. Rather the "central portion" is described in the '294 patent [Forber] as a rigid or radiopaque center band assembly 25, 125 or 225 which is fixed to the metal fabric.

Thus, the rejection of independent claims 1, 13 and 20 and their corresponding dependent claims is not proper and the claimed invention cannot be said to be anticipated by the teachings of the '294 patent or the '552 patent.

The examiner allowed the claims as amended.

Although the applicant did not expressly contradict the examiner's assumption that claim 20 required a tubular metal fabric, "an applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005). As noted above, the applicant responded to the examiner's rejections by amending claims 1, 13, 20, and 21. The applicant noted that claims 1 and 13 were directed to devices comprising a metal fabric, but the applicant did not describe claim 20 in the same manner. Claim 21, which depends from claim 20, was amended to require formation of the device from a metal fabric instead of a continuous tubular metal fabric.[3] The applicant highlighted the inability of the central portions of Forber and the '552 Patent to allow lateral movement of the enlarged diameter portions with respect to each other, and the applicant asserted that the examiner had incorrectly assumed that the central portions of Forber and the '552 Patent were flexible or resilient. On this record, the Court does not discern a basis in the prosecution history to limit claim 20's flexible central portion to a metal fabric.

---

[3] As amended, claims 20 and 21 are:

**20.** A collapsible medical device, comprising two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device having a proximal end and a distal end, wherein at least one of the proximal and distal end includes means for securing said device to a delivery system, said device having a collapsed configuration for delivery through a channel in a patient's body.

**21.** The device as recited in claim **20**, wherein said device is formed from a metal fabric consisting of a plurality of woven metal strands.

9

**A0022**

In short, the Court does not construe claim 20's flexible central portion to require a metal fabric.

*Between*

AGA's primary objection to "between" is one of claim differentiation. "'When different words or phrases are used in separate claims, a difference in meaning is presumed.' 'However, simply noting the difference in the use of claim language does not end the matter. Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.'" *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (quoting *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005)).

As noted above, claims 1 and 13 recite a central or resilient portion "disposed between the two enlarged diameter portions wherein said [central or resilient] portion allows lateral movement of each of said two enlarged diameter portions with respect to the other." Claim 20 does not use "between": "a flexible central portion interconnecting the two enlarged diameter portions wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other." Claims that depend from claim 20 add limitations to the flexible central portion. For instance, in claim 23, the "flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other." In claim 26, "a length of the flexible central portion is dimensioned such that a perimeter edge of the first enlarged diameter portion overlaps a perimeter edge of a second enlarged diameter portion." In claim 30, "the flexible central portion is shaped to form a stretchable portion, wherein the flexible central portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in a preset configuration."

According to the Summary of the Invention, "[t]he device of the present invention . . . includes two opposing spaced apart 'discs', patches, or retention skirts interconnected by a flexible or resilient central member.  The central member flexes both laterally and in the fore and aft directions while providing an inward tension against each of the discs."  '738 Patent, col.3, ll.13-18.  A principal object of the invention is "to provide a device suitable for occluding a septal defect that is capable of automatically adjusting to eccentric openings of the septal defect while providing an inward tension on the occluding portions of the device."  '738 Patent, col.3, ll.61-65.  Another object of the invention is "to provide an occluding device having outer occluding portions and a flexible resilient central portion that pulls the outer occluding portions together."  '738 Patent, col.4, ll.5-8.  Discussing the '738 Patent's figures, the Detailed Description of the Preferred Embodiment states:

> When the device **10** is in a relaxed state, the discs **12** and **14** tend to overlap and the central portion **16** extends into the recess formed by the inner surface of the discs **12** and **14**.  In this manner, when the discs **12** and **14** are pulled apart (see FIG. **3**) the spring-like action of the central portion **16** will cause the perimeter edge **22** and **24** of the corresponding disc to fully engage the sidewall of the septum (see FIGS. **11** and **12**).

'738 Patent, col.10, ll.6-13.  In addition, the length of the central portion may be varied:

> Those skilled in the art will appreciate that the device **10** is sized in proportion to the shunt to be occluded.  The diameter of each disc **12** and **14** may be varied as desired for differently sized openings in the septal wall.  Further, the length of the resilient central portion may be varied depending upon the thickness of the septal wall, and may range between 4 to 40 mm.

'738 Patent, col.10, ll.49-55.

The Joint Claim Construction Appendix contains definitions of "central" from several dictionaries.  The term essentially means in, at, or near the center.  The medical device of claim 20 comprises "two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions."  The intrinsic evidence reveals that the '738 Patent uses

"central" in a manner that it consistent with its ordinary meaning. The parties have not focused

on what, if any, clarity is achieved by construing "interconnecting" as "links together." The

Court concludes that no construction of "a flexible central portion interconnecting the two

enlarged diameter portions" is necessary.

## B. Resilient

"Resilient" appears in claim 23's description of the flexible central portion: "wherein said

flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged

diameter portions toward the other." AGA offered this construction of resilient: "tending to

spring back to a preset relaxed state upon removal of force." Asserting that "[i]t is unclear . . .

why the dispute between the parties necessitates a construction of 'resilient,'" W. L. Gore

asserted that the term should be construed as "spring-like."

The term "resilient" appears in several claims of the '738 Patent. In claims 3 to 7, the

central portion is shaped, helically shaped, coiled, bent, or shaped, respectively, "to form a

resilient portion to thereby pull the two enlarged diameter portions toward the other." Claim 13

recites "a resilient portion disposed between the two enlarged diameter portions wherein said

resilient portion allows lateral movement of each of said two enlarged diameter portions with

respect to the other." In claims 15 to 18, the resilient portion of claim 13 is shaped, helically

shaped, coiled, or bent, respectively, "to thereby pull the two enlarged diameter portions toward

the other." In claim 19, "the resilient portion may be flexed such that a first central axis of the

first enlarged diameter portion is offset from a second central axis of the second enlarged

diameter portion." In claims 23 and 24, the "flexible central portion is shaped to form a resilient

portion to thereby pull the two enlarged diameter portions toward the other." In claim 29, "the

resilient portion is shaped to form a stretchable portion," and "the resilient portion stretches to

adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in the relaxed configuration."

The term "resilient" appears throughout the '738 Patent. For instance, the Abstract states that "[t]he device is preferably made from a continuous tubular metal fabric and includes two outer occluding portions and a resilient central, spring-like interconnecting member." The Summary of the Invention indicates that "[t]he device of the present invention . . . includes two opposing spaced apart 'discs', patches, or retention skirts interconnected by a flexible or resilient central member" and that "[t]he central member flexes both laterally and in the fore and aft directions while providing an inward tension against each of the discs." '738 Patent, col.3, ll.12-18. It also describes fabric, wires, or strands that may be used to make the device:

> When forming these intravascular devices from a resilient metal fabric a plurality of resilient strands or wires are provided, with the metal fabric being formed by braiding the resilient strands to create a resilient material. This braided fabric is then deformed to generally conform to a molding surface of a molding element and the braided fabric is heat treated in contact with the surface of the molding element at an elevated temperature. The time and temperature of the heat treatment is selected to substantially set the braided fabric in its deformed state. After the heat treatment, the fabric is removed from contact with the molding element and will substantially retain its shape in the deformed state. The braided fabric so treated defines a relaxed state of a medical device which can be stretched or expanded and deployed through a catheter into a channel in a patient's body.

'738 Patent, col.3, ll.19-34. An object of the invention "is to provide an occluding device having outer occluding portions and a flexible resilient central portion that pulls the outer occluding portions together." '738 Patent, col.4, ll.5-8. The term "resilient" appears throughout the Detailed Description of the Invention in descriptions of the device and the flexible central portion. For instance, the device tends to resiliently return to a preferred relaxed shape when it exits a catheter:

> When the device exits the catheter, it will tend to resiliently return to a preferred relaxed shape. When the device springs back into this shape, it may tend to act

13

> against the distal end of the catheter effectively urging itself forward beyond the end of the catheter. This spring action could conceivably result in improper positioning of the device if the location of the device within a channel is critical, such as where it is being positioned in a shunt between two vessels. Since the threaded clamp can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment.

'738 Patent, col.9, ll.3-15. Describing embodiments shown in the figures of the '738 Patent, the Detailed Description of the Invention states that "the central portion is resilient and pulls the outer discs towards each other" and that "the spring-like action of the central portion . . . will cause the perimeter edge . . . of the corresponding disc to fully engage the sidewall of the septum." '738 Patent, col.9, l.60 to col.10, l.13.

The Joint Claim Construction Appendix contains definitions of "resilient" from several dictionaries. The definitions include "able to spring back to an original form or position after compression, stretching, etc."; "springing back; rebounding"; "returning to the original form or position after being bent, compressed, or stretched"; "[r]eturning to an original position; springing back, recoiling, etc."; "[e]lastic; resuming an original shape or position after compression, stretching, etc."; "[c]apable of returning to an original shape or position, as after having been compressed"; and "springing back into shape, etc." Claim 23 uses "resilient" in a manner that is consistent with the term's ordinary meaning. The Court concludes that construction of the term is not necessary.

## C.      Separation distance between the two enlarged diameter portions

"Separation distance between the two enlarged diameter portions" appears in claim 25. AGA asserted that no construction of the term is necessary. According to W. L. Gore, the term is indefinite. Noting the '738 Patent's failure to define the term or to explain how to measure the distance, W. L. Gore contended the patent's "failure to provide an objective standard for determining the 'separation distance' is fatal to claim 25."

The Federal Circuit recently summarized the law of indefiniteness:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The review of indefiniteness under 35 U.S.C. § 112, paragraph 2, proceeds as a question of law without deference." "The question of whether the claims meet the statutory requirements of § 112 ¶ 2 is a matter of construction of the claims, and receives plenary review on appeal . . . . The claims as granted are accompanied by a presumption of validity based on compliance with, *inter alia*, § 112 ¶ 2."

Claims need not be plain on their face in order to avoid condemnation for indefiniteness; rather, claims must only be amenable to construction. "[B]ecause claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet 'an exacting standard.'" Thus, "[a]n accused infringer must . . . demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal."

*Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1365-66 (Fed. Cir. 2011) (alterations in original) (citations omitted), *cert. denied*, 132 S. Ct. 1541 (2012). W. L. Gore's arguments to date have not established that "separation distance between the two enlarged diameter portions" is indefinite. Without precluding W. L. Gore from asserting the term's indefiniteness at an appropriate time, the Court declines to construe the term at this time.[4]

**D.      A thickness of a patient's atrial septum**

"A thickness of a patient's atrial septum" appears in claims 25 and 30. AGA asserted that no construction of the term is necessary. In the alternative, AGA contended that the term should be construed as "a thickness of the septal wall near the defect." According to W. L. Gore, "[t]his limitation requires that the device be deployed within a particular patient." W. L. Gore

---

[4]      In its responsive memorandum, W. L. Gore stated that it "is content to preserve the issue of indefiniteness for later resolution at summary judgment or trial."

also maintained that the limitation is indefinite: "It is unclear what is to be measured, how it is to be measured, and where it is to be measured to determine the thickness of the atrial septum within a particular patient. The thickness of the atrial septum varies within a particular patient."

The Court declines to adopt W. L. Gore's proposed construction. The language of the disputed limitation does not address the device's deployment. It is "a thickness of a patient's atrial septum."

The Background of the Invention's discussion of prior art acknowledged that "the thickness of the septal wall near the defect" must be determined "[p]rior to implantation of these devices" "in order that an appropriately sized device may be provided." '738 Patent, col.2, ll.18-21. The Detailed Description of the Invention noted that "the length of the resilient central portion may be varied depending upon the thickness of the septal wall, and may range between 4 to 40 mm." '738 Patent, col.10, ll.53-55. W. L. Gore's arguments to date have not established that "a thickness of a patient's atrial septum" is indefinite. Without precluding W. L. Gore from asserting the term's indefiniteness at an appropriate time, the Court declines to construe the term at this time.

### E. Means for securing said device to a delivery system

Claim 20 recites "means for securing said device to a delivery system." It is undisputed that this phrase is a means-plus-function limitation. The parties disputed both the claimed function and the corresponding structure. AGA proposed the following construction: "This is a means plus function limitation under 35 U.S.C. § 112, ¶6. The function is to secure the device to a delivery system. The corresponding structure is a threaded bore (and all equivalents thereof)." W. L. Gore offered the following construction:

This is a means plus function limitation under 35 U.S.C. § 112, ¶6.

The function is to maintain a hold on the device to control the manner in which the device is deployed and to allow the device to be retracted and redeployed.

The corresponding structure is a clamp having a threaded bore.

"An element in a claim for a combination may be expressed as a means . . . for performing a specified function without the recital of structure . . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. "Construction of a means-plus-function limitation includes two steps. 'First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)). "The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). "Ordinary principles of claim construction govern interpretation of the claim language used to describe the function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). "Failure to disclose adequate structure corresponding to the recited function in accordance with 35 U.S.C. § 112, paragraph 1, results in the claim being of indefinite scope, and thus invalid, under 35 U.S.C. § 112, paragraph 2." *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003); *see Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1329 (Fed. Cir. 2012) ("The indicated structure must limit the claim so as not to allow pure functional claiming.").

"'The court must construe the function of a means-plus-function limitation to include the limitations in the claim language, and only those limitations.'" *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011) (quoting *Cardiac Pacemakers*, 296 F.3d at 1113); *see Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) ("When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim."). Claim 20 recites "means for securing said device to a delivery system." The Court concludes that the claimed function is securing the device to a delivery system. The Court declines to import limitations from the specification to further construe "securing" in the manner articulated by W. L. Gore. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255-56 (Fed. Cir. 2011).

Having identified the claimed function, the Court turns to the corresponding structure. The Federal Circuit recently summarized the governing law:

> Our case law is clear that a means-plus-function claim limitation is limited to the structures disclosed in the specification and equivalents. A court must look to the specification to determine the structures that correspond to the claimed function. "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." If a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof.

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012) (alteration in original) (citations omitted). "Section 112 paragraph 6 does not 'permit incorporation of structure from the written description beyond that necessary to perform the claimed function.' Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) (citation omitted).

The '738 Patent clearly links or associates a clamp having a threaded bore to the claimed function:

- "The device has a relaxed low-profile configuration and *includes clamps that allow attachment of the device to an end of a delivery device or guide wire* . . . . *The guide wire or delivery catheter is then released from the clamp and removed.*" '738 Patent, col.3, ll.44-58 (emphasis added).

- "A clamp is attached to an outer end of each occluding member, *wherein the clamps are adapted for coupling to the end of a guidewire or catheter for delivery to a pre-selected site within the patient.*" '738 Patent, col.4, l.66 to col.5, l.3 (emphasis added).

- "By keeping the medical device attached to the delivery means, the operator can retract the device for repositioning relative to the abnormal opening, if it is determined that the device is not properly positioned within the shunt. A threaded clamp attached to the medical device allows the operator to control the manner in which the medical device is deployed out the distal end of the catheter. . . . Since the threaded clamp can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment." '738 Patent, col.8, l.64 to col.9, l.15.

- "The ends 26 and 28 of the tubular braided metal fabric device 10 are welded or clamped together with corresponding clamps 30 and 32 to avoid fraying. Of course the ends may alternately be held together by other means readily known to those skilled in the art. Further, it is to be understood that other suitable fastening means may be attached to the ends 26 and 28 in other ways, such as by welding, soldering, brazing, use of biocompatable cementious material or in any other suitable fashion. *The clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system.* In the embodiment shown, *the clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34* (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another. *The threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device.*" '738 Patent, col.10, ll.21-38 (emphasis added).

- "When the PFO occluding device is properly placed, the physician rotates the guidewire, *unscrewing the threaded distal end of the guidewire from the clamp 30 or 32 of the occluding device 10. The threads on the clamp are such that the rotation of the guidewire unscrews the guidewire from the clamp of the occluding device 10*, rather than merely rotating the occluding device. As noted above, the threaded clamp can also enable the operator to maintain a hold on the device during deployment, or enables the operator to control the spring action during deployment of the device to ensure proper positioning." '738 Patent, col.11, l.62 to col.12, l. 5 (emphasis added).

19

**A0032**

The Court concludes that the corresponding structure is a clamp having a threaded bore.

**F.      Means for attachment to a delivery device**

Claim 27 recites "means for attachment to a delivery device."  The parties' arguments are similar to those made with respect to claim 20's "means for securing said device to a delivery system."  The Court concludes that the claimed function is to attach the device to a delivery device and that the corresponding structure is a clamp having a threaded bore.

### III.      CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT the disputed terms and phrases are construed as set forth in this Order.

Dated: September 28, 2012

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

US005944738A

# United States Patent [19]

## Amplatz et al.

[11] **Patent Number:** 5,944,738

[45] **Date of Patent:** Aug. 31, 1999

[54] **PERCUTANEOUS CATHETER DIRECTED CONSTRICTING OCCLUSION DEVICE**

[75] Inventors: **Kurt Amplatz**, St. Paul; **Michael R. Afremov**, St. Louis Park, both of Minn.

[73] Assignee: **AGA Medical Corporation**, Golden Valley, Minn.

[21] Appl. No.: **09/019,620**

[22] Filed: **Feb. 6, 1998**

[51] Int. Cl.⁶ ................................................. **A61B 17/08**

[52] U.S. Cl. .......................................................... **606/213**

[58] Field of Search .................................... 606/213, 151, 606/1, 191–200

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,874,388 | 4/1975 | King et al. . |
| 4,007,743 | 2/1977 | Blake . |
| 4,665,906 | 5/1987 | Jervis . |
| 4,836,204 | 6/1989 | Landymore et al. . |
| 4,917,089 | 4/1990 | Sideris ..................................... 606/215 |
| 5,067,957 | 11/1991 | Jervis ...................................... 606/108 |
| 5,108,420 | 4/1992 | Marks ...................................... 606/213 |
| 5,171,259 | 12/1992 | Inoue ...................................... 606/213 |
| 5,190,536 | 3/1993 | Jervis ....................................... 606/78 |
| 5,246,445 | 9/1993 | Yachia et al. ........................... 606/108 |
| 5,334,217 | 8/1994 | Das .......................................... 606/213 |
| 5,451,235 | 9/1995 | Lock et al. .............................. 606/213 |
| 5,456,693 | 10/1995 | Conston et al. ......................... 606/192 |
| 5,466,242 | 11/1995 | Mori ........................................ 606/198 |
| 5,522,822 | 6/1996 | Phelps et al. ........................... 606/151 |
| 5,527,338 | 6/1996 | Purdy ...................................... 606/200 |
| 5,597,378 | 1/1997 | Jervis ....................................... 606/78 |
| 5,634,936 | 6/1997 | Linden et al. ........................... 606/213 |
| 5,645,558 | 7/1997 | Horton ..................................... 606/191 |
| 5,702,421 | 12/1997 | Schneidt ................................. 606/213 |
| 5,709,707 | 1/1998 | Lock et al. .............................. 606/213 |

FOREIGN PATENT DOCUMENTS

489252 10/1976 Australia .

OTHER PUBLICATIONS

"Catheter Closure of the Ductus Arteriosus" by Lee Benson, M.D.F.R.C.P. (C.)—Transcatheter Therapy in Pediatric Cardiology—pp. 321–3333.

"Transcatheter Closure of Atrial Septal Defects" by Larry A. Latson, M.D.—Transcatheter in Pediatric Cardiology—pp. 335–348.

Transcatheter Closure of Heart Defects: Role of "Buttoned" Devices by P. Syamasundar Rao, M.D., and E.B. Sideris, M.D. Transcatheter Therpy in Pediatric Cardiology—pp. 349–369.

*Primary Examiner*—Michael Buiz
*Assistant Examiner*—Vikki Trinh
*Attorney, Agent, or Firm*—Nikolai, Mersereau & Dietz, P.A.

[57] **ABSTRACT**

A collapsible medical device and associated method for occluding an abnormal opening in, for example, a body organ, wherein the medical device is shaped from a shape memory metal fabric. The device may be used, for example, to non-surgically treat a patient having a Patent Foramen Ovale (PFO) and resulting paradoxical cerebral emboli. The device is preferably made from a continuous tubular metal fabric and includes two outer occluding portions and a resilient central, spring-like interconnecting member. The metal fabric may be heat treated within a mold in order to substantially set a desired shape of the device. The medical device includes a fastener for attaching to the end of a guide wire or delivery catheter. The medical device having the desired relaxed shape may be collapsed and delivered through a catheter or the like for deployment in a desired channel or opening in a patient's body.

**30 Claims, 4 Drawing Sheets**





*Fig.1*

*Fig.2*

*Fig.3*



Fig.4

Fig.5

Fig.6

Fig.7



*Fig.8*

*Fig.9*

*Fig.10*



*Fig.11*



*Fig.12*



*Fig.13*

5,944,738

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**PERCUTANEOUS CATHETER DIRECTED CONSTRICTING OCCLUSION DEVICE**

## BACKGROUND OF THE INVENTION

### I. Field of the Invention

The present invention relates generally to a device and non-surgical method for treating certain cardiac defects. More particularly, the present invention relates to a low profile occlusion device for non-surgical treatment of a patient having a Patent Foramen Ovale (PFO) and resulting paradoxical cerebral emboli. The device made in accordance with the invention is capable of automatically adjusting to a septal defect having eccentric openings and is particularly well suited for delivery through a catheter or the like to a remote location in a patient's heart or in analogous vessel or organ within a patient's body.

### II. Description of the Related Art

A wide variety of intra cardiac devices are used in various medical procedures. Certain intravascular devices, such as catheters and guide wires, may be used to deliver fluids or other medical devices to a specific location within a patient's heart. For example, a catheter may be used to reach a selective coronary artery within the vascular system or the catheter and/or guidewire may be used to deliver a device to an interior chamber of the patient's heart. Complex devices may be delivered and used in treating specific abnormal conditions, such as devices used in removing vascular occlusions or devices used in treating septal defects and the like.

Balloon catheters and collapsible preformed polymeric devices similar to that disclosed by Landymore et al. in U.S. Pat. No. 4,836,204 and Linden et al. in U.S. Pat. No. 5,634,936 respectively have been used to occlude a septal defect. When using a balloon catheter similar to that disclosed in the '204 patent, an expandable balloon is carried on a distal end of the catheter. When the catheter is guided to the desired location, the balloon is filled with a fluid until it substantially fills the vessel and becomes lodged therein. Resins which will harden inside the balloon, such as an acrylonitrile, can be employed to permanently fix the size and shape of the balloon. The balloon can then be detached from the end of the catheter and left in place. The '936 device is expanded and hardened by a ternary system that modifies the pH and hydrophilicity of the device (see '936 patent, col. 6, ln 40–45). If these devices are not expanded completely they may not firmly lodge in the septal defect and may rotate and loosen from the septal wall, thereby releasing into the blood stream. Overfilling the '204 device is an equally undesirable occurrence which may lead to the rupture of the balloon and release of resins into the patient's bloodstream.

Mechanical embolization devices have been proposed in the past for occluding defects in a patient's intravascular system. The devices typically include a pair of spaced apart patches each having an internal collapsible frame (similar to the frame and outer membrane of an umbrella), wherein the opposing patch and frame are interconnected by a conjoint member. The patches are typically aligned and attached to a common axis of the conjoint member. The conjoint member may be a rigid or semi-rigid hub which minimizes the movement of the patches both laterally and fore and aft to thereby firmly retain the patches against the septal wall adjacent the defect. Patches that are attached to a common axis of the hub may become problematic when the septal defect to be occluded has eccentric openings. Since the patches are attached to a common rigid axis, at least one of the eccentric openings may not be completely covered by the respective patch. The rigid or semi-rigid hub prevents adjustment of the patches to compensate for the eccentric openings.

Representative examples of such mechanical devices are disclosed in King et al., U.S. Pat. No. 3,874,388 (the '388 patent), Das, U.S. Pat. No. 5,334,217 (the '217 patent), European application No. 0541,063 A2 (the '063 application), Sideris, U.S. Pat. No. 4,917,089 (the '089 patent), and Marks, U.S. Pat. No. 5,108,420 (the '420 patent). These devices are typically pre-loaded into an introducer or delivery catheter prior to the implantation procedure and are not commonly loaded by the physician during the medical procedure. During deployment of these devices, recapture into the delivery catheter is difficult if not impossible, thereby limiting the effectiveness of these devices.

Prior to implantation of these devices, the thickness of the septal wall near the defect and the approximate width of the defect must be determined in order that an appropriately sized device may be provided. A balloon catheter and a calibrated guidewire having radiopaque regions of known length, may be utilized by a physician during a preliminary fluoroscopic procedure to estimate the defect's size, shape and thickness of the septal wall near the defect. Although useful, the defects exact size and shape cannot be determined, thereby increasing the possibility of leakage around the occluding device. Hence, a device that inherently adjusts to the shape and thickness of the defect would be desirable.

Significantly, the size of the prior devices is inherently limited by the structure and form of the device. Also, when using occluding devices such as those disclosed in the '089, '388, '217, or '420 patents to occlude a septal defect, the pressure and therefore the chance of dislodgment of the device increases with an increase in size of the defect. Consequently, the prior devices require an oversized retention skirt positioned on each side of the defect. Oftentimes, the position of the septal defect dictates the size of the retention skirt. In a membranous type septal defect, it is difficult if not improbable to be able to effectively position the '388, '217, '089, or '420 device without at least partially closing off the aorta. Also, these disclosed devices tend to be rather expensive and time-consuming to manufacture.

Further, the shape of the prior devices (for example squares, triangles, pentagons, hexagons and octagons) require a larger surface contact area and have corners which may extend to the free wall of the atria. Each time the atria contracts (approximately 100,000 times per day) the corners extending to the atria walls are bent, creating structural fatigue fractures in approximately 30 percent of all cases. Furthermore, the previous devices require a French 14–16 introducing catheter, making it impossible to treat children affected with congenital defects with these devices. Hence, it would be advantageous to provide a reliable embolization device which is both easy to deploy through a 6–7 French catheter and which automatically adjusts to the shape and thickness of the defect. The present invention addresses these and other disadvantages of the prior art.

## SUMMARY OF THE INVENTION

It is accordingly a principal object of the present invention to provide a reliable, low-profile, intra cardiac occlusion device capable of automatically adjusting the alignment within a septal defect having eccentric openings, wherein the device is suitable for treating septal defects including a

5,944,738

3

Patent Foramen Ovale (PFO). PFO is essentially a condition wherein an abnormal, wide, opening is present in the septal wall between the two atria of the heart. Blood can flow directly between these two atria, compromising the normal flow of blood and efficiency of the patient's heart. The abnormal opening or septal defect may not extend perpendicularly through the septal wall. Rather, the center of the opening in the septal wall in the left atrium may be eccentric to the center of the opening in the septal wall in the right atrium, thereby requiring eccentric positioned "patches" to effectively occlude the defect. Also, the septal wall may be very thin requiring a minimal separation distance between the two occluding "patches". The device of the present invention is preferably formed from a continuous tubular metal fabric and includes two opposing spaced apart "discs", patches, or retention skirts interconnected by a flexible or resilient central member. The central member flexes both laterally and in the fore and aft directions while providing an inward tension against each of the discs.

When forming these intravascular devices from a resilient metal fabric a plurality of resilient strands or wires are provided, with the metal fabric being formed by braiding the resilient strands to create a resilient material. This braided fabric is then deformed to generally conform to a molding surface of a molding element and the braided fabric is heat treated in contact with the surface of the molding element at an elevated temperature. The time and temperature of the heat treatment is selected to substantially set the braided fabric in its deformed state. After the heat treatment, the fabric is removed from contact with the molding element and will substantially retain its shape in the deformed state. The braided fabric so treated defines a relaxed state of a medical device which can be stretched or expanded and deployed through a catheter into a channel in a patient's body. Those skilled in the art will appreciate that the cavities of the molds must mirror the desired shape of the device and further molding elements are described in co-pending application Ser. No. 08/647,712 filed on May 14, 1996, and entitled PERCUTANEOUS CATHETER DIRECTED INTRAVASCULAR OCCLUSION DEVICE which is assigned to the same assignee as the present invention, the entire disclosure of which is incorporated herein by reference.

The device of the present invention has a specific shape which is particularly well suited for occluding a PFO. The device has a relaxed low-profile configuration and includes clamps that allow attachment of the device to an end of a delivery device or guide wire (allowing recovery of the device after placement). In use, a guide catheter is positioned and advanced in a patient's body such that the distal end of the catheter is adjacent a desired treatment site for treating a physiological condition. The medical device of the present invention having a predetermined shape is then stretched and inserted into the lumen of the catheter. The device is urged through the catheter and out the distal end, whereupon, due to its shape memory property it will tend to substantially return to its relaxed state adjacent the treatment site. The guide wire or delivery catheter is then released from the clamp and removed.

## OBJECTS

It is accordingly a principal object of the present invention to provide a device suitable for occluding a septal defect that is capable of automatically adjusting to eccentric openings of the septal defect while providing an inward tension on the occluding portions of the device.

Another object of the present invention is to provide a device suitable for occluding septal defects having eccentric

4

openings, wherein the device is particularly well suited for delivery through a catheter or the like to a remote location in a patient's heart or in an analogous vessel or organ within a patient's body.

A further object of the present invention is to provide an occluding device having outer occluding portions and a flexible resilient central portion that pulls the outer occluding portions together.

These and other objects, as well as these and other features and advantages of the present invention will become readily apparent to those skilled in the art from a review of the following detailed description of the preferred embodiment in conjunction with the accompanying claims and drawings in which like numerals in the several views refer to corresponding parts.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a Patent Foramen Ovale occluding device in accordance with the present invention;

FIG. 2 is a side elevational view of the medical device of the type shown in FIG. 1;

FIG. 3 is a partial sectional side elevational view of the medical device of the type shown in FIG. 2, shown partially stretched along its longitudinal axis;

FIG. 4 is a side elevational view of the medical device of the type shown in FIG. 3, shown stretched along its longitudinal axis slightly more than in FIG. 3;

FIG. 5 is a side elevational view of the medical device of the type shown in FIG. 4, shown stretched along its longitudinal axis slightly more than in FIG. 4;

FIG. 6 is a side elevational view of the medical device of the type shown in FIG. 1 shown partially stretched, wherein the outer perimeter of the spaced apart discs are offset;

FIG. 7 is a partial sectional side elevational view of the medical device of the type shown in FIG. 1, shown partially stretched along its longitudinal axis;

FIG. 8 is a side elevational view of another embodiment of the present invention shown partially stretched along its longitudinal axis;

FIG. 9 is a side elevational view of another embodiment of the present invention shown partially stretched along its longitudinal axis;

FIG. 10 is a side elevational view of another embodiment of the present invention shown partially stretched along its longitudinal axis;

FIG. 11 is a partial sectional side elevational view of the embodiment of FIG. 8 shown occluding a PFO of the septal wall;

FIG. 12 is a partial sectional side elevational view of the embodiment of FIG. 8 shown occluding a PFO of the septal wall; and

FIG. 13 is a partial sectional side elevational view of the embodiment of FIG. 1 shown occluding an atrial septal defect.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a percutaneous catheter directed occlusion device for use in occluding an abnormal opening in a patient's body that is particularly well suited for occluding a PFO (see FIGS. 11–13). The occluding device includes two spaced apart occluding members interconnected by a flexible, resilient center portion. A clamp is attached to an outer end of each occluding member, wherein

5,944,738

| 5 | 6 |

the clamps are adapted for coupling to the end of a guidewire or catheter for delivery to a pre-selected site within the patient. In the preferred embodiment, the occluding device is formed from a single continuous tubular metal fabric.

The tubular fabric is formed from a plurality of wire strands having a predetermined relative orientation between the strands. Those skilled in the art will appreciate that the pick and pitch of the braided wires may be varied depending upon the desired density of the fabric. The tubular fabric has metal strands which define two sets of essentially parallel generally spiraling and overlapping strands, with the strands of one set having a "hand", i.e. a direction of rotation, opposite that of the other set. This tubular fabric is known in the fabric industry as a tubular braid.

The pitch of the wire strands (i.e. the angle defined between the turns of the wire and the axis of the braid) and the pick of the fabric (i.e. the number of turns per unit length) as well as some other factors, such as the number of wires employed in a tubular braid, the size or diameter of each wire in the braid, and the diameter of the braid are all important in determining a number of important properties of the device. For example, the greater the pick and pitch of the fabric, and hence the greater the density of the wire strands in the fabric, the stiffer the device will be. Also, the greater the diameter of each wire of the braid, the stiffer the device will be. Having a greater wire density will also provide the device with a greater wire surface area, which will generally enhance the tendency of the device to occlude the area in which it is deployed. This thrombogenicity can be either enhanced by a coating of a thrombolytic agent, or abated by a coating of a lubricious, anti-thrombogenic compound. When using a tubular braid to form a device of the present invention, a tubular braid of about 4 mm in diameter having approximately 72 braided wires is suitable for fabricating devices capable of occluding abnormal openings and/or septal defects.

The wire strands of the tubular metal fabric are preferably manufactured from so-called shape memory alloys. Such alloys tend to have a temperature induced phase change which will cause the material to have a preferred configuration which can be fixed by heating the material above a certain transition temperature to induce a change in the phase of the material. When the alloy is cooled back down, the alloy will "remember" the shape it was in during the heat treatment and will tend to assume that configuration unless constrained from so doing.

Without any limitation intended, suitable wire strand materials may be selected from a group consisting of a cobalt-based low thermal expansion alloy referred to in the field as ELGELOY, nickel-based high temperature high-strength "superalloys" (including nitinol) commercially available from, for example, Haynes International under the trade name HASTELLOY, nickel-based heat treatable alloys sold under the name INCOLOY by International Nickel, and a number of different grades of stainless steel. The important factor in choosing a suitable material for the wire strands is that the wires retain a suitable amount of the deformation induced by a molding surface (as described below) when subjected to a predetermined heat treatment.

In the preferred embodiment, the wire strands are made from a shape memory alloy, NiTi (known as nitinol) which is an approximately stoichiometric alloy of nickel and titanium and may also include other minor amounts of other metals to achieve desired properties. Handling requirements and variations of NiTi alloy composition are known in the art, and therefore such alloys need not be discussed in detail

here. U.S. Pat. No. 5,067,489 (Lind) and 4,991,602 (Amplatz et al.), the teachings of which are incorporated herein by reference, discuss the use of shape memory NiTi alloys in guide wires. Such NiTi alloys are preferred, at least in part, because they are conveniently available and more is known about handling such alloys than other known shape memory alloys. NiTi alloys are also very elastic and are said to be "super elastic" or "pseudo elastic". This elasticity allows a device of the invention to return to a preset configuration after deployment.

When forming a medical device in accordance with the present invention, an appropriately sized piece of tubular metal fabric is inserted into a mold, whereby the fabric deforms to generally conform to the shape of the cavities within the mold. The shape of the cavities are such that the metal fabric deforms into substantially the shape of the desired medical device. Cores within the cavities may be used to further form the shape of the fabric within the cavities. The ends of the wire strands of the tubular metal fabric should be secured to prevent the metal fabric from unraveling. A clamp or welding, as further described below, may be used to secure the ends of the wire strands.

During the molding procedure, a molding element may be positioned within the lumen of the tubular braid prior to insertion into the mold to thereby further define the molding surface. If the ends of the tubular metal fabric have already been fixed by a clamp or welding, the molding element may be inserted into the lumen by manually moving the wire strands of the fabric apart and inserting the molding element into the lumen of the tubular fabric. By using such a molding element, the dimensions and shape of the finished medical device can be fairly accurately controlled and ensures that the fabric conforms to the mold cavity.

The molding element may be formed of a material selected to allow the molding element to be destroyed or removed from the interior of the metal fabric. For example, the molding element may be formed of a brittle or friable material. Once the material has been heat treated in contact with the mold cavities and molding element, the molding element can be broken into smaller pieces which can be readily removed from within the metal fabric. If this material is glass, for example, the molding element and the metal fabric can be struck against a hard surface, causing the glass to shatter. The glass shards can then be removed from the enclosure of the metal fabric.

Alternatively, the molding element can be formed of a material that can be chemically dissolved, or otherwise broken down, by a chemical agent which will not substantially adversely affect the properties of the metal wire strands. For example, the molding element can be formed of a temperature resistant plastic resin which is capable of being dissolved with a suitable organic solvent. In this instance, the metal fabric and the molding element can be subjected to a heat treatment to substantially set the shape of the fabric in conformance with the mold cavity and molding element, whereupon the molding element and the metal fabric can be emersed in the solvent. Once the molding element is substantially dissolved, the metal fabric can be removed from the solvent.

Care should be taken to ensure that the materials selected to form the molding element are capable of withstanding the heat treatment without losing its shape, at least until the shape of the fabric has been set. For example, the molding element could be formed of a material having a melting point above the temperature necessary to set the shape of the wire strands, but below the melting point of the metal

A0224

5,944,738

7

forming the strands. The molding element and metal fabric could then be heat treated to set the shape of the metal fabric, whereupon the temperature would be increased to substantially completely melt the molding element, thereby removing the molding element from within the metal fabric.

Those skilled in the art will appreciate that the specific shape of the molding element produces a specific shape of the molded device. If a more complex shape is desired, the molding element and mold may have additional parts including a camming arrangement, but if a simpler shape is being formed, the mold may have few parts. The number of parts in a given mold and the shapes of those parts will be dictated almost entirely by the shape of the desired medical device to which the metal fabric will generally conform.

When the tubular braid, for example, is in its preformed relaxed configuration, the wire strands forming the tubular braid will have a first predetermined relative orientation with respect to one another. As the tubular braid is compressed along its axis, the fabric will tend to flare out away from the axis conforming to the shape of the mold. When the fabric is so deformed the relative orientation of the wire strands of the metal fabric will change. When the mold is assembled, the metal fabric will generally conform to the molding surface of the interior cavity. After undergoing the shape memory process, the resulting medical device has a preset relaxed configuration and a collapsed or stretched configuration which allows the device to be passed through a catheter or other similar delivery device. The relaxed configuration is generally defined by the shape of the fabric when it is deformed to generally to conform to the molding surface of the mold.

Once the tubular or planar metal fabric is properly positioned within a preselected mold with the metal fabric generally conforming to the molding surface of the cavities therein, the fabric can be subjected to a heat treatment while it remains in contact with the molding surface. Suitable heat treatment processing of nitinol wire to set a desired shape are well known in the art. Spirally wound nitinol coils, for example, are used in a number of medical devices, such as in forming the coils commonly carried around distal links of guide wires. A wide body of knowledge exists for forming nitinol in such devices, so there is no need to go into great detail here on the parameters of a heat treatment for the nitinol fabric preferred for use in the present invention. Briefly, though, it has been found that holding a nitinol fabric at about 500 degrees centigrade to about 550 degrees centigrade for a period of about 1 to 30 minutes, depending upon the softness or hardness of the device to be made will tend to set the fabric in its deformed state, i.e., wherein it conforms to the molding surface of the mold cavities. At lower temperatures, the heat treatment time will tend to be greater (e.g., about 1 hour at about 350 degrees centigrade) and at higher temperatures the time will tend to be shorter (e.g., about 30 seconds at about 900 degrees centigrade). These parameters can be varied as necessary to accommodate variations in the exact composition of the nitinol, prior heat treatment of the nitinol, the desired properties of the nitinol in the finished article, and other factors known to those skilled in this field.

Instead of relying on convection heating or the like, it is also known in the art to apply an electrical current to the nitinol to heat it. In the present invention, this can be accomplished by, for example, connecting electrodes to each end of the metal fabric. The wire can then be heated by resistance heating of the wires in order to achieve the desired heat treatment, which will tend to eliminate the need to heat the entire mold to the desired heat treating temperature in

8

order to heat the metal fabric to the desired temperature. The materials, molding elements and methods of molding a medical device from a tubular or planar metal fabric is further described in co-pending U.S. patent application Ser. No. 08/647,712, filed May 14, 1996 and assigned to the same assignee as the present invention, the entire disclosure of which is incorporated herein by reference.

Heat treating the metal fabric at temperatures ranging between 500–550 degrees centigrade substantially sets the shapes of the wire strands in a reoriented relative position conforming the shape of the fabric to the molding surface. When the metal fabric is removed from the mold, the fabric maintains the shape of the molding surfaces of the mold cavities to thereby define a medical device having a desired shape. After the heat treatment, the fabric is removed from contact with the molding cavity and will substantially retain its shape in a deformed state. If a molding element is used, this molding element can be removed as described above.

The time required for the heat treating process will depend in large part upon the material of which the wire strands of the metal fabric are formed and mass of the mold, but the time and temperature of the heat treatment should be selected to substantially set the fabric in its deformed state, i.e., wherein the wire strands are in their reoriented relative configuration and the fabric generally conforms to the molding surface. The required time and temperature of the heat treatment can vary greatly depending upon the material used in forming the wire strands. As noted above, one preferred class of materials for forming the wire strands are shape memory alloys, with nitinol, a nickel titanium alloy, being particularly preferred. If nitinol is used in making the wire strands of the fabric, the wire strands will tend to be very elastic when the metal is in its austenitic phase; this very elastic phase is frequently referred to as a super elastic or pseudo elastic phase. By heating the nitinol above a certain phase transition temperature, the crystal structure of the nitinol metal will tend to "set" the shape of the fabric and the relative configuration of the wire strands in the positions in which they are held during the heat treatment.

Once a device having a preselected shape has been formed, the device may be used to treat a physiological condition of a patient. A medical device suitable for treating the condition is selected. Once the appropriate medical device is selected, a catheter or other suitable delivery device may be positioned within a channel in a patient's body to place the distal end of the delivery device adjacent the desired treatment cite, such as immediately adjacent (or even within) the shunt of an abnormal opening in the patient's organ for example.

The delivery device (not shown) can take any suitable shape, but desirably comprises an elongate flexible metal shaft having a threaded distal end. The delivery device can be used to urge the medical device through the lumen of a catheter for deployment in a channel of a patient's body. When the device is deployed out the distal end of the catheter, the device will still be retained by the delivery device. Once the medical device is properly positioned within the shunt of the abnormal opening, the distal end of the catheter may be pressed against the medical device and the metal shaft or guidewire can be rotated about its axis to unscrew the medical device from the threaded distal end of the shaft. The catheter and guidewire are then withdrawn.

By keeping the medical device attached to the delivery means, the operator can retract the device for repositioning relative to the abnormal opening, if it is determined that the device is not properly positioned within the shunt. A

5,944,738

9                                                        10

threaded clamp attached to the medical device allows the operator to control the manner in which the medical device is deployed out the distal end of the catheter. When the device exits the catheter, it will tend to resiliently return to a preferred relaxed shape. When the device springs back into this shape, it may tend to act against the distal end of the catheter effectively urging itself forward beyond the end of the catheter. This spring action could conceivably result in improper positioning of the device if the location of the device within a channel is critical, such as where it is being positioned in a shunt between two vessels. Since the threaded clamp can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment.

The medical device can be collapsed into its collapsed configuration and inserted into the lumen of the catheter. The collapsed configuration of the device may be of any shape suitable for easy passage through the lumen of a catheter and proper deployment out the distal end of the catheter. For example, the PFO occluding device may have a relatively elongated collapsed configuration wherein the device is stretched along its longitudinal axis (see FIG. 5). This collapsed configuration can be achieved simply by stretching the device generally along its axis, e.g. by manually grasping the clamps and pulling them apart, which will tend to collapse the relaxed diameter portions of the device inwardly toward the device's axis. Loading such a device into a catheter may be done at the time of implantation and does not require pre-loading of the introducer or catheter.

If the device is to be used to permanently occlude a channel in the patient's body, one can simply retract the catheter and remove it from the patient's body. This leaves the medical device deployed in the patient's vascular system so that it may occlude the blood vessel or other channel in the patient's body. In some circumstances, the medical device may be attached to a delivery system in such a manner as to secure the device to the end of the delivery means. Before removing the catheter in such a system, it may be necessary to detach the medical device from the delivery means before removing the catheter and the delivery means.

When the device is deployed in a patient, thrombi will tend to collect on the surface of the wires. By having a greater wire density, the total surface area of the wires will be increased, increasing the thrombotic activity of the device and permitting it to relatively rapidly occlude the vessel in which it is deployed. It is believed that forming the occlusion device from a 4 mm diameter tubular braid having a pick of at least about 40 and a pitch of at least about 30° will provide sufficient surface area to substantially completely occlude an abnormal opening in the septal wall. If it is desired to increase the rate at which the device occludes, any of a wide variety of known thrombotic agents can be applied to the device. Those skilled in the art will appreciate that an occluding membrane, fiber, or mesh may be positioned within either or both discs 12 and 14 to further enhance the occluding feature of each disc (see FIG. 3).

Having described the details of the invention, specific reference to the Figures will next be presented. The several Figures illustrate several embodiments of the invention wherein the central portion is resilient and pulls the outer discs towards each other. Referring first to the FIGS. 1 and 2, there is shown generally the device 10 suitable for occluding a Patent Foramen Ovale (PFO). In its relaxed, unstretched state (see FIG. 2), the device 10 generally includes two aligned discs 12 and 14 linked together by a

resilient central portion 16. The plurality of braided wires form an outer 18 and inner 20 surface of each disc. The inner surface 20 of each disc may be concave or cupped (see also FIG. 7) to ensure that the outer perimeter edge 22 and 24 of each disc 12 and 14 respectively contacts the septal wall 40.

When the device 10 is in a relaxed state, the discs 12 and 14 tend to overlap and the central portion 16 extends into the recess formed by the inner surface of the discs 12 and 14. In this manner, when the discs 12 and 14 are pulled apart (see FIG. 3) the spring-like action of the central portion 16 will cause the perimeter edge 22 and 24 of the corresponding disc to fully engage the sidewall of the septum (see FIGS. 11 and 12). FIGS. 3–5 illustrates sequentially the stretching, spring-like action of the bent central portion 16. Without any limitation intended, during the formation of the device 10, the tubular braid (in the region forming the central portion 16) is partially flattened to enhance the spring-like action of the central portion 16. FIG. 6 illustrates that the discs 12 and 14 may be offset laterally by stretching the central portion 16.

The ends 26 and 28 of the tubular braided metal fabric device 10 are welded or clamped together with corresponding clamps 30 and 32 to avoid fraying. Of course the ends may alternately be held together by other means readily known to those skilled in the art. Further, it is to be understood that other suitable fastening means may be attached to the ends 26 and 28 in other ways, such as by welding, soldering, brazing, use of biocompatable cementious material or in any other suitable fashion. The clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system. In the embodiment shown, the clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another. The threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device.

FIGS. 8–10 show additional embodiments of the device 10 wherein the shape of the resilient central portion 16 is varied. The central portion 16 is flexible in both the lateral and fore and aft directions. This flexibility provides a self centering feature of the device, wherein the discs 12 and 14 tend to automatically center themselves around the adjacent opening of the defect (see FIGS. 11 and 12) while tending to pull the discs toward the other. The central portion 16 may include a helical spring-like shape (see FIG. 9), a coil shape (see FIG. 10), or a bent shape (see FIG. 2).

Those skilled in the art will appreciate that the device 10 is sized in proportion to the shunt to be occluded. The diameter of each disc 12 and 14 may be varied as desired for differently sized openings in the septal wall. Further, the length of the resilient central portion may be varied depending upon the thickness of the septal wall, and may range between 4 to 40 mm.

The PFO occlusion device 10 can advantageously be made in accordance with the method outlined above. The device is preferably made from a 0.005 inch nitinol wire mesh. The braiding of the wire mesh may be carried out with 28 picks per inch at a shield angle of about 64 degrees using a Maypole braider with 72 wire carriers. The stiffness of the PFO device 10 may be increased or decreased by altering the wire size, the shield angle, the pick size, braid diameter, the number of wire carriers, or the heat treatment process. Those skilled in the art will recognize from the preceding discussion that the cavities of a mold must be shaped consistent with the desired shape of the PFO device.

A0226

5,944,738

11

When using untreated NiTi fabrics, the strands will tend to return to their unbraided configuration and the braid can unravel fairly quickly unless the ends of the length of the braid are constrained relative to one another. The clamps 30 and 32 are useful to prevent the braid from unraveling at either end, thereby effectively defining an empty space within a sealed length of fabric. These clamps 30 and 32 hold the ends of the cut braid together and prevent the braid from unraveling. Although soldering and brazing of NiTi alloys has proven to be fairly difficult, the ends may be welded together, such as by spot welding with a laser welder. When cutting the fabric to the desired dimensions, care should be taken to ensure that the fabric will not unravel. In the case of tubular braids formed of NiTi alloys, for example, the individual strands will tend to return to their heat set configuration unless constrained. If the braid is heat treated to set the strands in the braided configuration, they will tend to remain in the braided form and only the ends will become frayed. However, it may be more economical to simply form the braid without heat treating the braid since the fabric will be heat treated again in forming the medical device.

Use of a device 10 of the present invention will now be discussed in greater detail with respect to occluding a PFO. The device may be delivered and properly placed using two dimensional echocardiography and Doppler color flow mapping. As indicated above, the delivery device can take any suitable shape, preferably comprising an elongated flexible metal shaft similar to a conventional guide wire. The delivery device is used to advance the PFO occlusion device through the lumen of a small diameter cylindrical tube, such as a delivery catheter, for deployment. The PFO device 10 is loaded into the small diameter cylindrical tube by using a loading sheath to stretch the device and put the same in an elongated or stretched condition. The device may be inserted into the lumen of the tube during the procedure or preassembled at a manufacturing facility, in that the devices of the present invention do not take on a permanent set when maintained in a compressed state.

From a femoral vein approach, the delivery catheter or tube is passed across the PFO. The device 10 is advanced through the delivery catheter until the distal end becomes unconstrained on exiting the end of the catheter, whereupon it assumes its disc-like shape in the left atrium (see FIG. 13). The delivery catheter is then pulled back in the proximal direction across the PFO and the delivery device is likewise pulled in a proximal direction, urging the distal disc against the septum. The delivery catheter is then further pulled away from the septum, allowing the proximal disc to extend out of the delivery catheter, where it resiliently returns to its predefined relaxed disc-like shape. In this manner, the PFO device is positioned such that the distal disc presses against one side of the septum while the proximal disc presses against the other side of the septum. In order to increase its occluding ability, the device can contain polyester fibers or a nylon fabric (see FIG. 3). In instances where the device is improperly deployed on a first try, the device may be recovered by pulling the delivery device proximally, thereby retracting the device 10 back into the delivery catheter prior to a second attempt at positioning the device relative to the defect.

When the PFO occluding device is properly placed, the physician rotates the guidewire, unscrewing the threaded distal end of the guidewire from the clamp 30 or 32 of the occluding device 10. The threads on the clamp are such that the rotation of the guidewire unscrews the guidewire from the clamp of the occluding device 10, rather than merely

12

rotating the occluding device. As noted above, the threaded clamp can also enable the operator to maintain a hold on the device during deployment, or enables the operator to control the spring action during deployment of the device to ensure proper positioning.

This invention has been described herein in considerable detail in order to comply with the Patent Statutes and to provide those skilled in the art with the information needed to apply the novel principles and to construct and use embodiments of the example as required. However, it is to be understood that the invention can be carried out by specifically different devices and that various modifications can be accomplished without departing from the scope of the invention itself

What is claimed is:

1. A collapsible medical device, comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end, each end having means for securing the metal fabric attached thereto, thereby inhibiting unraveling of the metal fabric, said metal fabric having a relaxed configuration having two enlarged diameter portions and a central portion disposed between the two enlarged diameter portions wherein said central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device further having a collapsed configuration for delivery through a channel in a patient's body.

2. The device as recited in claim 1, wherein each enlarged diameter portion has an inner and outer wall such that the inner wall of at least one of the enlarged diameter portions is at least partially concave.

3. The device as recited in claim 1, wherein said central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

4. The device as recited in claim 1, wherein said central portion is helically shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

5. The device as recited in claim 1, wherein said central portion is coiled to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

6. The device as recited in claim 1, wherein said central portion is bent to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

7. The device as recited in claim 2, wherein said central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

8. The device as recited in claim 1, wherein a separation distance between the two enlarged diameter portions is less than a thickness of a patient's atrial septum.

9. The medical device as recited in claim 1, wherein an inner surface of a first enlarged diameter portion is at least partially concave and a length of the central portion is dimensioned such that a perimeter edge of the first enlarged diameter portion overlaps a perimeter edge of a second enlarged diameter portion.

10. The medical device as recited in claim 1, said two enlarged diameter portions consisting of a first enlarged partially concave diameter portion and a second enlarged partially concave diameter portion.

11. The medical device as recited in claim 1, said two enlarged diameter portions consisting of a first enlarged diameter portion and a second enlarged diameter portion, wherein the central portion may be flexed such that a first central axis of the first enlarged diameter portion is offset from a second central axis of the second enlarged diameter portion.

5,944,738

<table>
<tr><td>13</td><td>14</td></tr>
</table>

**12.** The medical device as recited in claim **1**, wherein said means for securing includes means for attachment to a delivery device.

**13.** A collapsible medical device, comprising a metal fabric including a plurality of woven metal strands having a proximal end and a distal end, each end having means for securing the metal fabric attached thereto, thereby inhibiting unraveling of the metal fabric, said metal fabric having a relaxed configuration having two enlarged diameter portions and a resilient portion disposed between the two enlarged diameter portions wherein said resilient portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device further having a collapsed configuration for delivery through a channel in a patient's body.

**14.** The device as recited in claim **13**, wherein each enlarged diameter portion has an inner and outer wall such that the inner wall of at least one of the enlarged diameter portions is at least partially concave.

**15.** The device as recited in claim **13**, wherein said resilient portion is shaped to thereby pull the two enlarged diameter portions toward the other.

**16.** The device as recited in claim **13**, wherein said resilient portion is helically shaped to thereby pull the two enlarged diameter portions toward the other.

**17.** The device as recited in claim **13**, wherein said resilient portion is coiled to thereby pull the two enlarged diameter portions toward the other.

**18.** The device as recited in claim **13**, wherein said resilient portion is bent to thereby pull the two enlarged diameter portions toward the other.

**19.** The medical device as recited in claim **13**, said two enlarged diameter portions consisting of a first enlarged diameter portion and a second enlarged diameter portion, wherein the resilient portion may be flexed such that a first central axis of the first enlarged diameter portion is offset from a second central axis of the second enlarged diameter portion.

**20.** A collapsible medical device, comprising two enlarged diameter portions and a flexible central portion interconnecting the two enlarged diameter portions wherein said flexible central portion allows lateral movement of each of said two enlarged diameter portions with respect to the other, said device having a proximal end and a distal end, wherein at least one of the proximal and distal end includes means for securing said device to a delivery system, said device having a collapsed configuration for delivery through a channel in a patient's body.

**21.** The device as recited in claim **20**, wherein said device is formed from a metal fabric consisting of a plurality of woven metal strands.

**22.** The device as recited in claim **20**, wherein each enlarged diameter portion has an inner and outer wall such that the inner wall of at least one of the enlarged diameter portions is at least partially concave.

**23.** The device as recited in claim **20**, wherein said flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

**24.** The device as recited in claim **21**, wherein said flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

**25.** The device as recited in claim **20**, wherein a separation distance between the two enlarged diameter portions is less than a thickness of a patient's atrial septum.

**26.** The medical device as recited in claim **20**, wherein an inner surface of a first enlarged diameter portion is at least partially concave and a length of the flexible central portion is dimensioned such that a perimeter edge of the first enlarged diameter portion overlaps a perimeter edge of a second enlarged diameter portion.

**27.** The medical device as recited in claim **20**, wherein said means for securing includes means for attachment to a delivery device.

**28.** The medical device as recited in claim **1**, wherein the flexible central portion is shaped to form a stretchable portion, and further wherein the flexible central portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in the relaxed configuration.

**29.** The medical device as recited in claim **13**, wherein the resilient portion is shaped to form a stretchable portion, and further wherein the resilient portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in the relaxed configuration.

**30.** The medical device as recited in claim **20**, wherein the flexible central portion is shaped to form a stretchable portion, wherein the flexible central portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in a preset configuration.

* * * * *

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2013, a true and correct copy of the

foregoing document was served by ECF upon the following counsel of record:

| | |
|---|---|
| Jared B. Briant | Jared.briant@FaegreBD.com |
| Leslie B. Prill | Leslie.prill@FaegreBD.com |
| Katherine S. Razavi | Kate.razavi@FaegreBD.com |
| James Poradek | James.poradek@FaegreBD.com |
| Kevin P. Wagner | Kevin.wagner@FaegreBD.com |
| Nina Y. Wang | Nina.wang@FaegreBD.com |

/s/J. Derek Vandenburgh
J. Derek Vandenburgh

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C), Fed. R. App. P., I certify that this brief

complies with the type-volume limitation of Rule 32(a)(7)(B), Fed. R. App. P.

This brief contains 7,651 words, calculated by the word processing system used in

its preparation.

Dated:   November 21, 2013


/s/J. Derek Vandenburgh
J. Derek Vandenburgh