2013-1583

_____

# United States Court of Appeals
# for the Federal Circuit

_____

AGA MEDICAL CORPORATION,

*Plaintiff-Appellant*,

v.

W. L. GORE & ASSOCIATES, INC.,

*Defendant-Appellee*.

_____

**Appeal from the United States District Court for the District of Minnesota
in Case No. 10-CV-3734, Judge Joan N. Ericksen**

_____

**BRIEF OF APPELLEE W. L. GORE & ASSOCIATES, INC.**

_____

JAMES W. PORADEK
KATHERINE S. RAZAVI
FAEGRE BAKER DANIELS LLP
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

JARED B. BRIANT
LESLIE B. PRILL
FAEGRE BAKER DANIELS LLP
1700 Lincoln Street
Denver, CO 80203
(303) 607-3500

*Attorneys for Defendant-Appellee W. L. Gore & Associates, Inc.*

February 5, 2014

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................1

STATEMENT OF THE ISSUES......................................................................2

STATEMENT OF FACTS ...............................................................................2

   I.   The Parties ..........................................................................................2

   II.   The Technology ...................................................................................4

   III.   The '738 Patent....................................................................................5

   IV.   The Gore HELEX® Septal Occluder ...............................................10

   V.   District Court Proceedings..................................................................12

SUMMARY OF THE ARGUMENT ..............................................................17

ARGUMENT ..................................................................................................19

   I.   The District Court CORRECTLY CONSTRUED THE "MEANS FOR SECURING SAID DEVICE TO THE DELIVERY SYSTEM" TO BE "A CLAMP HAVING A THREADED BORE." ........................................19

      A.  The Quid Pro Quo Underlying Means-Plus-Function Claiming .............19

      B.  The Correct Corresponding Structure Is a Clamp Having a Threaded Bore ...........................................................................................22

          1.  The specification teaches that the corresponding structure is a "clamp" having a threaded bore....................................................23

          2.  The specification identifies the clamp as necessary for securing the device to the delivery system ...................................................30

          3.  AGA previously admitted that the "clamp having a threaded bore" construction is "correct."......................................................33

   II.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BASED ON AGA'S FAILURE TO PROFFER EVIDENCE THAT THE CLAIMED "MEANS FOR SECURING SAID DEVICE TO A DELIVERY SYSTEM" IS PRESENT IN THE ACCUSED DEVICE ....................................................................................35

      A.  Bhattacharya's Expert Report Violated a Number of Baseline Rules for Proving Patent Infringement.....................................................35

      C.  AGA's Arguments in Defense of the Bhattacharya Report Are Incorrect .........................................................................................40

1.  Bhattacharya did not apply the "clamp having a threaded bore" construction to his infringement analysis .......................................40

2.  AGA was required to present evidence of infringement of all limitations, including the "clamp having a threaded bore" structure ...........................................................................................49

CONCLUSION .......................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
  659 F.3d 1121 (Fed. Cir. 2011) ........................................................19, 36, 38, 46

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006) ....................................................................20, 50

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
  145 F.3d 1303 (Fed. Cir. 1998) ..............................................................16, 33, 47

*Conoco Inc. v. Energy & Evtl. Int'l, L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ...........................................................................35

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004) ...........................................................................42

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009) ............................................................19, 36, 38

*Halliburton Oil Well Cementing Co. v. Walker*,
  329 U.S. 1 (1946)...................................................................................................21

*Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
  589 F.3d 1179 (Fed. Cir. 2009) ............................................................37, 38, 41

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ...........................................................................35

*Med. Instrumentation & Diagnostic Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ............................................................17, 21, 22

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
  671 F.3d 1291 (Fed. Cir. 2012) ............................................................13, 20, 51

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ....................................................................20, 21

*O.I. Corp. v. Tekmar Co.*,
  115 F.3d 1576 (Fed. Cir. 1987) ...........................................................................22

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999) ................................................16, 19, 37, 38, 49

*TechSearch, L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002) ....................................................................36, 38

*Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*,
    983 F.2d 1039 (Fed. Cir. 1993) ....................................................................20, 21

*Wiener v. NEC Elecs., Inc.*,
    102 F.3d 534 (Fed. Cir. 1996) .............................................................36, 38, 48

**FEDERAL STATUTES**

35 U.S.C. § 112, ¶ 6.......................................................... 16, 17, 19, 20, 21, 22, 51

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee W. L. Gore & Associates, Inc. certifies the following:

1.    The full names of every party represented by me are:  *W. L. Gore & Associates, Inc.*

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest):  *N/A.*

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are as follows:

*W. L. Gore & Associates, Inc. has no parent corporation.  Its stock is privately held and no publicly held corporation owns ten percent or more of its stock.*

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:

*Faegre Baker Daniels LLP:*

*James P. Poradek, Kevin P. Wagner, Nina Y. Wang, Jared B. Briant, Katherine S. Razavi, Leslie B. Prill, Andrew M. McCoy, Ryan Clough, Natalie Hanlon-Leh, Christopher Burrell, and Jacqueline T. Harlow.*

*Locke Lord Bissell & Liddell, LLP*

*Andrea L. Wayda, John Sweeney, Matthew Blackburn, Myoka Goodin, Patrick Gallagher, Steve Purdy, Galyn Gifford, Jennifer Kenedy, and Zachary Sibersher.*

## STATEMENT OF THE ISSUES

1.      Whether the district court properly construed the "means for securing said device to a delivery system" in the asserted patent claims to be "a clamp having a threaded bore," when a clamp having a threaded bore is the only structure disclosed in the specification for securing the device to the delivery system.

2.      Whether the district court properly granted summary judgment of noninfringement with respect to the "means for securing said device to a delivery system" when AGA's infringement expert failed to apply the district court's construction of "clamp having a threaded bore" in his infringement analysis.

## STATEMENT OF FACTS

### I.      The Parties.

Gore is a family-owned company based in Newark, Delaware, with a medical device business based in Flagstaff, Arizona.  Gore is perhaps best known for its proprietary GORE-TEX® material, which is often used in outerwear and made from a material called expanded polytetrafluoroethylene ("ePTFE").  Over the past several decades, Gore has developed uses for ePTFE in a broad variety of products, including medical devices like the Gore HELEX® Septal Occluder, the product at issue in this litigation:



(A1481.)

AGA is a Minnesota-based medical device company founded in the 1990s, which focuses on medical devices constructed from a woven metal fabric material. In this lawsuit, AGA asserts that it is the owner of the patent-in-suit, U.S. Patent No. 5,944,738 ("the '738 patent"). AGA and related entities have made and sold woven metal fabric devices similar to the figure below:



(A0220, Fig. 8.)

## II.    The Technology.

The two medical devices pictured above are referred to as "septal occluders," which are delivered through catheters to treat defects in the septal wall of the heart.  These defects, which are essentially holes in the septum, are called "atrial septal defects" or "ASDs."  (A0002.)  (One particular type of defect often mentioned in this case is a "patent foramen ovale" or "PFO.")  (A0002.)   Septal occluders generally function as patches to close ASDs, stopping the potentially harmful flow of blood between the chambers of the heart.  (A0222, 1:55-2:4.)  By using catheters to deliver occluders to the heart, patients are able to avoid open heart surgery—an important consideration, given the risks of surgery and the fact that many patients with ASDs are children.

AGA did not invent the first septal occluder.  (AGA Br. 6; A0222, 2:5-18.)  Such devices have been widely known and used by doctors since as early as the 1970s.  (A0222, 2:5-18.)  In general, a septal occluder consists of two occluding patches separated by a central connecting portion.  (A0222, 1:55-59.)  The device is typically collapsible, so that it can be placed into a narrow catheter that will travel through a patient's arteries or veins, and then expand to a larger configuration in the heart upon exiting the catheter.  (A0222, 1:30-2:17.)  After implantation, the central portion of a septal occluder typically rests within a defect

4

and the two patches block undesirable blood flow between the heart chambers.

(A0222, 1:52-2:4.)

## III.    The '738 Patent.

The '738 patent is entitled "Percutaneous Catheter Directed Constricting

Occlusion Device" and describes in its specification a specific category of metal

fabric septal occluders, including the devices depicted in the figures below:



(A0219-A0220, Figs. 7-8.)

The '738 patent issued on August 31, 1999 from an application filed on

February 6, 1998.  (A0217.)  The two claims asserted against Gore are dependent

claims 23 and 30, which both depend from unasserted independent claim 20.  The

limitation at issue in this appeal is the claimed "means for securing said device to a

delivery system," which appears in independent claim 20.  The claims recite the

following:

> 20.  A  collapsible  medical  device,  comprising  two
> enlarged diameter portions and a flexible central portion
> interconnecting  the  two  enlarged  diameter  portions
> wherein  said  flexible  central  portion  allows  lateral
> movement of each of said two enlarged diameter portions

with respect to the other, said device having a proximal end and a distal end, wherein at least one of the proximal and distal end includes **means for securing said device to a delivery system**, said device having a collapsed configuration for delivery through a channel in a patient's body.

[Asserted Claim] 23. The device as recited in claim 20, wherein said flexible central portion is shaped to form a resilient portion to thereby pull the two enlarged diameter portions toward the other.

[Asserted Claim] 30. The medical device as recited in claim 20, wherein the flexible central portion is shaped to form a stretchable portion, wherein the flexible central portion stretches to adjust to a thickness of a patient's atrial septum while the two enlarged diameter portions remain in a preset configuration.

(A0228, 13:39-14:46 (emphasis added).)

The crux of AGA's argument on appeal is its contention that the threaded bore is the only aspect of the disclosed clamp structure that matters in terms of "securing the device to the delivery system."  But the specification of the '738 patent directly contradicts AGA's position.  The specification never talks about a threaded bore in isolation, without reference to the clamp structure that surrounds it, when discussing how the device is secured to a delivery system.  To the contrary, the Summary of the Invention introduces the securing feature of its invention by emphasizing the overall clamp structure and not mentioning a threaded bore at all:  "The device of the present invention has a . . . configuration

that **includes clamps that allow attachment of the device to a delivery device or guide wire**." (A0223, 3:43-48 (emphasis added).)

Moreover, when the patent describes the clamp structure in detail, it makes clear that the fundamental structure securing the device to the delivery system is the clamp, of which the threaded bore on the delivery system side is only one aspect. The most detailed description of the clamp appears in column 10, where the specification explains how the clamps "serve to connect the device to a delivery system":

> The clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system. In the embodiment shown, the clamps 30 and 32 are generally cylindrical in shape and **have a threaded bore 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric** to substantially prevent the wires from moving relative to one another. The **threaded bore is adapted to receive and engage a threaded distal end of a delivery device**.

(A0226, 10:28-38 (emphasis added).) In other words, the specification explains that the clamp is a cylindrical piece of hardware, with a threaded bore running through it, which operates to secure the device to the delivery system at two ends. One end of the clamp is used for "receiving" the ends of the metal fabric occluder. (A0226, 10:32-36.) The other end of the clamp is used for "receiv[ing]" the threaded distal end of the delivery device. (A0226, 10:36-38.) In this manner, the clamp "serve[s] to connect the device to a delivery system." (A0226, 10:28-38.)

7

The passage quoted above also refers to Figure 7, which shows the clamp (32) with a threaded bore (34) "receiving" the ends of the metal fabric, but with no delivery device shown:



(A0219.)

In its opening brief, AGA included its own illustration depicting the interior of the clamp and showing how the clamp would interact with the device and delivery system, based on the descriptions in the specification.  (AGA Br. 12.) Like Figure 7, AGA's illustration shows a separate cylindrical piece of hardware—the "clamp"—in which a threaded bore runs lengthwise through the clamp and receives the end of the occluder (on the left) and the threaded distal end of the delivery device (on the right):



(AGA Br. 12.)

Other sections of the specification describe the "clamp" and reiterate that the **clamp** is the fundamental structure that "allow[s] attachment of the device to a delivery device." (A0223, 3:43-48.) Indeed, a number of the references to the "clamp"—including those in the Summary of the Invention—do not even contain a reference to a threaded bore:

- "The device of the present invention has a specific shape which is particularly well suited for occluding a PFO. The device has a relaxed low-profile configuration that **includes clamps that allow attachment of the device to a delivery device or guide wire** (allowing recovery of the device after placement)." (A0223, Summary of the Invention, 3:43-48 (emphasis added).)

- "[After the medical device is deployed,] [t]he guide wire or delivery catheter is then released from **the clamp** and removed." (A0223, Summary of the Invention, 3:43-58 (emphasis added).)

- "**A clamp** is attached to an outer end of each occluding member, wherein **the clamps** are adapted for coupling to the end of a guidewire or catheter for delivery to a pre-selected site within the patient." (A0223-24, 4:66-5:3 (emphasis added).)

- "A **threaded clamp attached to the medical device** allows the operator to control the manner in which the medical device is deployed out the distal end of the catheter." (A0225-26, 8:67-9:3 (emphasis added).)

- "Since **the threaded clamp** can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment." (A0226, 9:11-15 (emphasis added).)

- "When the PFO occluding device is properly placed, the physician rotates the guidewire, unscrewing the threaded distal end of the guidewire from **the clamp** 30 or 32 of the occluding device 10. The **threads on the clamp** are such that the rotation of the guidewire unscrews the guidewire from **the**

9

**clamp** of the occluding device 10, rather than merely rotating the device.  As noted above, **the threaded clamp** can also enable the operator to hold on the device during deployment, or enables the operator to control the spring action during deployment of the device to ensure proper positioning." (A0227, 11:62-12:5 (emphasis added).)

The '738 patent does not disclose any other structure apart from a clamp having a threaded bore for securing the claimed occluder device to the delivery system.

## IV.    The Gore HELEX® Septal Occluder.

The accused product in this case is the Gore HELEX® Septal Occluder ("HELEX"), an award-winning device that was independently developed by Gore engineers before AGA filed the application for the '738 patent.  (A1663-A1664, A2137, A2141.)  The United States Patent & Trademark Office has granted Gore five patents covering the HELEX device.  (A1540-A1562.)

Unlike the device described in the '738 patent, the central component of the HELEX device is Gore's patented GORE-TEX® ePTFE material, which is supported by a single wire wound into a helical shape.  (A2137-38.)  When deployed in the heart, the GORE-TEX® fabric forms two soft patches on either side of the septum.  (A2138.)

Critically, the HELEX secures to its delivery system in a fundamentally different way than the device described in the '738 patent.  (A2139.)  While the '738 patent only discloses a clamp having a threaded bore as the mechanism for

connecting the device and delivery system, the HELEX device does not include a

clamp, a clamp having a threaded bore, or any other threaded components.

(A2139.) Rather, the HELEX device is secured to a catheter-based delivery

system by sliding the entire device over a cylindrical delivery "mandrel."

(A2139.) When the HELEX device exits a catheter in the heart, it slides off the

mandrel and the helical shape creates two disks of ePTFE material that cover the

atrial septal defect. (A2137-41.) The photograph below shows the HELEX device

in a partially deployed configuration, with the mandrel running through three

eyelets spaced along the helical nitinol wire of the device:



(A1481.) The following illustration shows in cross-section the unique and

complex structure by which the helically wound wire frame of the HELEX

interacts by sliding on the mandrel to secure the HELEX to the delivery system.

There is nothing remotely close to the claimed "clamp" structure in the HELEX.

The various places where the HELEX structure interfaces with the mandrel before deployment are indicated in red:



(A2949, Fig. 11(b) (highlighting added).)

## V.    District Court Proceedings.

Initially, when AGA filed this case in August 2010, it alleged that the HELEX device infringed five claims of the '738 patent.  (A0003.)  Following claim construction, however, AGA executed a covenant not to sue and dropped three of the asserted claims, narrowing its infringement allegations to dependent claims 23 and 30.  (A0003.)  Gore counterclaimed seeking a declaratory judgment of noninfringement and invalidity of the asserted claims.

Claim construction was conducted in a separate proceeding prior to summary judgment. Among other terms, the parties asked the district court to construe the "means for securing said device to a delivery system" limitation, which the parties agreed was a means-plus-function limitation. (A0029.) Gore argued that the corresponding structure was a "clamp having a threaded bore," while AGA argued that the corresponding structure was a "threaded bore." (A0029-30.)

In an order dated September 28, 2012, the district court construed the term "means for securing said device to a delivery system," finding that the claimed function is "securing the device to a delivery system" and the corresponding structure is "a clamp having a threaded bore." (A0031, 33.) The district court rejected AGA's proposed "threaded bore" construction, holding that the entire "clamp having a threaded bore" structure performs the function of "securing the device to a delivery system." (A0029-31.) In arriving at this construction, the district court cited numerous excerpts from the specification (ignored by AGA in its opening brief to this Court) that identified only a "clamp having a threaded bore" as the structure that secured the device to delivery system. The district court carefully discussed the controlling Federal Circuit case law on means-plus-function claims and concluded that the "'738 Patent clearly links or associates a clamp having a threaded bore to the claimed function." (A0032; *see Mettler-Toledo, Inc.*

13

*v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012) ("Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.").)

Following claim construction, AGA persisted in ignoring the "clamp" aspect of "clamp having a threaded bore." AGA offered a single expert report on infringement addressing the "means for securing," from Dr. Kaushik Bhattacharya, a materials engineer. (A1880-90.) Bhattacharya did not opine that the HELEX device contains an actual clamp having a threaded bore and did not otherwise apply the "clamp having a threaded bore" construction to his analysis. Instead, Bhattacharya opined that "the **threaded bore** serves as the means for securing the device to the delivery system." (A1884, ¶ 63 (emphasis added).) His opinion on this point directly contradicted the district court's claim construction and the district court's conclusion that the patent "clearly links or associates **a clamp having a threaded bore** to the claimed function." (A0032 (emphasis added).) In setting out his structural equivalence opinion, Bhattacharya also limited his analysis to a comparison between a portion of the HELEX device and a portion of the "threaded bore" component of the clamp, not the complete "clamp having a threaded bore." (A1883-88, ¶¶ 61-69.) Bhattacharya's report was AGA's only

evidence that the HELEX device met the "means for securing" limitation of the asserted claims.

Given AGA's failure to provide an infringement opinion that applied the district court's "clamp having a threaded bore" construction to the HELEX device, Gore filed a motion for summary judgment of noninfringement. At the summary judgment hearing, AGA's counsel admitted time after time that the district court's "clamp having a threaded bore" construction was "correct." (*See, e.g.,* A3010-11 ("What you said, and it's correct, is that the patent linked the function of means for securing to a clamp with a threaded bore. That's absolutely correct."); A3014 ("[I]n this patent where they are claiming means for securing . . . we go to this patent, and we find the structure in this patent that is the clamp with a threaded bore. That's the structure. It's nothing else.").) Nonetheless, even though AGA's counsel assured the district court that he agreed with its claim construction, AGA argued that it was appropriate to focus solely on the "threaded bore" aspect of the corresponding structure when performing the infringement analysis. (A2005 ("[T]he proper infringement analysis involves an examination of only that part of the structure of the 'clamp having a threaded bore' that is necessary to perform the claimed function of 'securing the device to the delivery system.'").)

On July 23, 2013, the district court rejected AGA's arguments and granted summary judgment of noninfringement.[1]  Carefully examining each paragraph of Bhattacharya's structural equivalence opinion, the district court held that Bhattacharya failed to raise a genuine issue of material fact because "[t]he expert's opinion rests on an analysis that did not apply the Court's claim construction." (A0007.)  Specifically, the district court concluded that "AGA's expert analyzed the issue of equivalency as if the Court had concluded that the corresponding structure was simply a threaded bore."  (A0007.)  Relying on this Court's precedent, the district court rejected AGA's suggestion that it was appropriate to focus on a single component of the corresponding structure during the infringement analysis:

> The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function.  This is why structures with different numbers of parts may still be equivalent under § 112, ¶ 6, thereby meeting the claim limitation.   The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which "corresponds" to the claimed function.   Further deconstruction or parsing is incorrect.  *Odetics*, 185 F.3d at 1268 (citations omitted) (explaining that *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145

---

[1] Gore moved for summary judgment on three separate grounds.  Because the district court granted summary judgment of noninfringement on the "means for securing said device to a delivery system" limitation, the court did not rule on Gore's other pending arguments, which sought summary judgment of invalidity.

F.3d 1303 (Fed. Cir. 1998), does not support component-by-component analysis of equivalence).

(A0008-9.)

## SUMMARY OF THE ARGUMENT

In its appeal, AGA seeks to avoid the bargain it made with the patent office and the public when it chose to use means-plus-function language to claim the "means for securing said device to a delivery system" in the asserted claims of the '738 patent. As this Court has emphasized, "[t]he duty of a patentee to clearly link or associate structure with the claimed function is the **quid pro quo** for allowing the patentee to express the claim in terms of function under section 112, paragraph 6." *Med. Instrumentation & Diagnostic Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (emphasis added). When AGA chose to use functional claim language to describe its invention, it also chose to disclose in the specification of the '738 patent a single, very specific structure that performed the function of "securing the device to a delivery system." That structure was a "clamp having a threaded bore." Under § 112, ¶ 6, the "price that must be paid" by AGA for using means-plus-function claiming is that the "means for securing said device to a delivery system" must be limited to a "clamp having a threaded bore" (and its equivalents). *Id.* at 1211.

On appeal, AGA tries to avoid paying the price of this statutory quid pro quo in two ways. First, AGA argues that the district court erred by construing the

17

corresponding structure for "securing the device to the delivery system" as "a clamp having a threaded bore" rather than a "threaded bore" by itself. But AGA's claim construction argument defies both the patent specification and common sense. As the district court carefully detailed in its claim construction order below, the '738 patent repeatedly and uniformly identifies the "clamp" as the critical component in connecting the occluder and the delivery system together. AGA ignores this evidence from the patent specification. Moreover, on a practical level, AGA fails to explain how a negative space like a "threaded bore" can ever be divorced from the "clamp" structure that surrounds and defines it in the '738 patent. In fact, during the oral argument on summary judgment, AGA's counsel abandoned this very claim construction position, repeatedly telling the district court that its construction of "clamp having a threaded bore" was "correct" and "absolutely correct." (A3001-02, A3006-11, A3014.) Inexplicably, AGA now tries to resurrect on appeal the very claim construction argument it abandoned—and waived—before the district court.

Second, AGA attempts to evade the statutory quid pro quo by defending its use of an infringement expert who failed to apply the district court's claim construction of "a clamp having a threaded bore" to the accused Gore device. There is nothing more fundamental in patent law than the rule that, to determine infringement, "the claim as properly construed must be compared to the accused

device or process." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (quotation omitted). Here, AGA's expert refused to follow that rule. Instead, he repeated the same mistake AGA made during claim construction, insisting that the only aspect of the "clamp with a threaded bore" that mattered in determining infringement was the "threaded bore." The law does not permit an expert to "deconstruct[] or pars[e]" the "overall structure that corresponds to the claimed function" in evaluating means-plus-function equivalents. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999). Nor does the law allow an expert to contradict the district court's claim construction when opining on infringement. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). Summary judgment of non-infringement was therefore appropriate.

For these reasons, the district court's claim construction and summary judgment rulings should be affirmed in their entirety.

## ARGUMENT

**I.    THE DISTRICT COURT CORRECTLY CONSTRUED THE "MEANS FOR SECURING SAID DEVICE TO THE DELIVERY SYSTEM" TO BE "A CLAMP HAVING A THREADED BORE."**

### A.    The Quid Pro Quo Underlying Means-Plus-Function Claiming.

The parties have agreed that "means for securing said device to a delivery system" is a means-plus-function limitation governed by 35 U.S.C. § 112, ¶ 6.

"Construction of a means-plus-function limitation includes two steps.  'First, the court must determine the claimed function.  Second, the court must identify the corresponding structure in the written description of the patent that performs the function.'"  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)).  Here on appeal, AGA disputes the district court's claim construction of the corresponding structure for the "means for securing said device to the delivery system" in the asserted patent claims.

The patent statutes provide "explicit guidance" that means-plus-function elements must be construed to cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof."  *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993) (quoting 35 U.S.C. § 112, ¶ 6).  As this Court has stated, "[s]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *Mettler-Toledo, Inc.*, 671 F.3d at 1296.  For this reason, if "a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof."  *Id.*

This Court has frequently used the term "quid pro quo" to describe the statutory requirement that means-plus-function elements must be limited to the

structure disclosed in the specification. *See, e.g., Med. Instrumentation,* 344 F.3d

at 1211; *Noah*, 675 F.3d at 1318. More than sixty years ago, prior to enactment of

§ 112, ¶ 6, the Supreme Court was so troubled by the "overhanging threat" of

overbreadth and ambiguity in functional claim language that it ruled that means-

plus-function claims could not be valid. *Valmont*, 983 F.2d at 1042 (discussing

*Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946)). Congress

responded to these concerns by including § 112, ¶ 6 in the 1952 Patent Act. This

new provision permitted means-plus-function claims—but with a major "string

attached." *Id.* In the new language of § 112, ¶ 6, Congress announced that

patentees would be permitted the benefit of using functional language in means-

plus-function claims, but in exchange for that convenience patentees would be

required to describe in the patent specification some structure to perform the

claimed function. *Id.* Importantly, means-plus-function claims would be limited

to the structure disclosed in the specification and its equivalents. *Id.* Limiting the

claims to the disclosed structure thus "confine[d] the breadth of protection

otherwise permitted by purely functional claiming," addressing the invalidity

concern expressed by the Supreme Court in *Halliburton*. *Noah*, 675 F.3d at 1318

(quoting *Valmont*, 983 F.2d at 1042). In sum, "[t]he duty of a patentee to clearly

link or associate structure with the claimed function is the quid pro quo for

allowing the patentee to express the claim in terms of function under section 112, paragraph 6." *Med. Instrumentation,* 344 F.3d at 1211.

Applying the principles of this quid pro quo, this Court has stated that patentees who choose to use means-plus-function language cannot expand the scope of their patent claims beyond the structure disclosed in the patent specification and its equivalents. *See, e.g., Med. Instrumentation*, 344 F.3d at 1211 ("[T]he price that must be paid for use of that convenience [of means-plus-function claiming] is limitation of the claim to the means specified in the written description and equivalents thereof.") (quoting *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1987)).

## B.    The Correct Corresponding Structure Is a Clamp Having a Threaded Bore.

In this case, AGA is trying to evade the bargain it made with the patent office and the public when it chose to claim the securing feature of its invention using means plus function language.  When AGA chose functional claim language for the '738 patent—"means for securing said device to a delivery system"—it also chose to disclose in the specification a single structure that performed the function of "securing the device to a delivery system."  That corresponding structure was a "clamp having a threaded bore."  Under § 112, ¶ 6, the "price that must be paid" by AGA is limitation of the claim to a "clamp having a threaded bore" and its equivalents. *Med. Instrumentation*, 344 F.3d at 1211.

AGA makes two basic arguments for its proposed "threaded bore" construction. First, AGA argues that the specification supports the "threaded bore" construction. Second, AGA argues that the "clamp" is unnecessary for performing the function of "securing the device to a delivery system." AGA is wrong on both counts.

### 1.     The specification teaches that the corresponding structure is a "clamp" having a threaded bore.

AGA first argues that the specification supports its construction of a "threaded bore" by itself. It does no such thing. The specification of the '738 patent uniformly states that a "clamp" or "threaded clamp" performs the function of securing the claimed medical device to the delivery system. The "threaded bore" is described as a feature of the clamp, but is never described as securing the device to the delivery system by itself. What follows is a comprehensive collection of excerpts from the specification that discuss the "securing the device to a delivery system" function, all of which support the "clamp having a threaded bore" construction:

- "The device of the present invention . . . has a relaxed low-profile configuration that **includes clamps that allow attachment of the device to a delivery device or guide wire** (allowing recovery of the device after placement)." (A0223, 3:43-48 (emphasis added).)

- "[After the medical device is deployed,] [t]he guide wire or delivery catheter is then released from **the clamp** and removed." (A0223, 3:43-58 (emphasis added).)

23

- **"A clamp is attached to an outer end of each occluding member, wherein the clamps are adapted for coupling to the end of a guidewire or catheter for delivery to a pre-selected site within the patient."** (A0223-24, 4:66-5:3 (emphasis added).)

- "A **threaded clamp attached to the medical device** allows the operator to control the manner in which the medical device is deployed out the distal end of the catheter." (A0225-26, 8:67-9:3 (emphasis added).)

- "Since **the threaded clamp** can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment." (A0226, 9:11-15 (emphasis added).)

- "**The clamps** 30 and 32 tying together the wire strands at corresponding ends 26 and 28 **also serve to connect the device to a delivery system.** In the embodiment shown, **the clamps** 30 and 32 are generally cylindrical in shape and **have a threaded bore** 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another. The threaded bore is adapted to receive and engage a threaded distal end of a delivery device." (A0226, 10:28-38 (emphasis added).)

- "When the PFO occluding device is properly placed, the physician rotates the guidewire, unscrewing the threaded distal end of the guidewire from **the clamp** 30 or 32 of the occluding device 10. The **threads on the clamp** are such that the rotation of the guidewire unscrews the guidewire from **the clamp** of the occluding device 10, rather than merely rotating the device. As noted above, **the threaded clamp** can also enable the operator to maintain a hold on the device during deployment, or enables the operator to control the spring action during deployment of the device to ensure proper positioning." (A0227, 11:62-12:5 (emphasis added).)

Remarkably, AGA chose to ignore all of the above sections from the specification in its opening brief to this Court. In fact, even though the above excerpts were cited by the district court as important intrinsic evidence, AGA does

not mention that part of the opinion and instead characterizes the district court's claim construction analysis as incomplete.  (AGA Br. 28.)  Obviously, AGA cannot win the appeal of a means-plus-function claim construction by ignoring the language of the specification that it finds unhelpful.

Equally important, AGA cannot win a claim construction argument by ignoring common sense.  At its core, AGA's argument ignores the basic fact that a "threaded bore" is a negative space that must necessarily be defined by some kind of surrounding structure.  In the '738 patent—as part of the bargain that AGA reached with the patent office and the public—AGA chose to specifically define that surrounding structure as a "clamp" (which itself has a particular structure described in the specification).  Just as there cannot be a bagel hole without the surrounding bagel, there cannot in the '738 patent be a threaded bore without the surrounding clamp.

Indeed, AGA's own brief shows the practical impossibility of discussing the threaded bore without  also discussing the surrounding clamp structure disclosed in the '738 patent.  For example, AGA explains that the patent "states that the clamps may also function to secure the device to the delivery system."  (AGA Br. 11.) AGA also explains that the "claimed securing function" is performed when "[o]ne end of **the cylinder** [i.e. the clamp] screws onto the delivery system."  (AGA Br. 37 (emphasis added).)  If, as AGA concedes, the specification states that the

clamps "function to secure the device to the delivery system," then the clamps are part of the corresponding structure. And if, as AGA concedes, the securing function is performed by "the cylinder," AGA cannot ask this Court to somehow erase the cylinder component of the clamp structure.

Despite these concessions, AGA nonetheless argues that the Court should ignore the "clamp" structure disclosed in the patent and find that the corresponding structure is the "threaded bore" alone. In fact, in this appeal, AGA seems to be stretching an already untenable argument well past the breaking point by suggesting for the first time that the corresponding structure should be limited to a small portion of the "threaded bore"—specifically, "a 'threaded bore' on the end of the medical device that the delivery system screws into." (AGA Br. 24.)

AGA has no intrinsic evidence to support its proposed construction. AGA's entire analysis of the specification spans one paragraph and relies on two references to the "threaded bore" in the '738 patent that AGA quotes out of context to disguise the fact that the discussion of the "threaded bore" is part of larger discussion concerning the "clamp" structure. (AGA Br. 24-25.)

First, AGA argues: "The specification explains that the 'threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device.'" (AGA Br. 24 (citing A0226, 10:36-38).) AGA deletes the preceding sentences, which explain that the threaded bore is housed inside the clamps and clarify that the

"clamps" themselves "serve to connect to the device to a delivery system."

(A0226, 10:28-38.)

| AGA's Brief | Actual Patent Language |
|---|---|
| "The specification explains that the 'threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device.' (A0226, 10:36-38.)" (AGA Br. 24.) | "**The clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system.  In the embodiment shown, the clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another.**  The threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device."  (A0226, 10:28-38 (emphasis added).) |

Second, AGA argues: "And the specification teaches that '[o]nce the medical device is properly positioned . . . the [delivery device] can be rotated about its axis to unscrew the medical device from the threaded distal end of the [delivery device].'"  (AGA Br. 24 (citing A0225, 8:58-63).)  This excerpt does not even explicitly refer to the "threaded bore" of the medical device—only to the "threaded distal end" of the delivery system.  Moreover, the surrounding sentences clarify that the structure that rotates and unscrews from the delivery device is a "threaded clamp."  AGA deletes these sentences too.

| AGA Brief | Actual Patent Language |
|---|---|
| "And the specification teaches that '[o]nce the medical device is properly positioned . . . the [delivery device] can be rotated about its axis to unscrew the medical device from the threaded distal end of the [delivery device]. (A0225, 8:58-63.) (AGA Br. 24.) | "Once the medical device is properly positioned within the shunt of the abnormal opening, the distal end of the catheter may be pressed against the medical device and the metal shaft or guidewire can be rotated about its axis to unscrew the medical device from the threaded distal end of the shaft. The catheter and guidewire and then withdrawn. By keeping the medical device attached to the delivery means, the operator can retract the device for repositioning relative to the abnormal opening, if it is determined that the device is not properly positioned within the shunt. **A threaded clamp attached to the medical device allows the operator to control the manner in which the medical device is deployed out of the distal end of the catheter . . . . Since the threaded clamp can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment.**" (A0225-26, 8:58-9:5; A0226, 9:11-15 (emphasis added).) |

AGA also characterizes the "threaded bore" as a "discrete structural feature," separate from the clamp, pointing to the fact that Figures 7, 8 and 10 all identify a threaded bore as 34. (AGA Br. 25.) As a practical matter, however, it is impossible to separate the concept of a "threaded bore" that is located inside a larger "clamp" structure. If the "clamp" structure surrounding the "bore" was

somehow eliminated, the bore would cease to exist.  And, of course, the patent

does not attempt to do the impossible.  In Figures 7, 8 and 10, the threaded bore 34

is always shown to be within the clamp 32.  Moreover, the description of these

figures in the specification makes it clear that the threaded bore exists only as part

of the surrounding clamp: "In the embodiment shown, the clamps 30 and 32 are

generally cylindrical in shape and have a threaded bore 34 . . . ."  (A0226, 10:28-

38.)  Again, AGA does not provide this context.

| AGA's Brief | Actual Patent Language |
|---|---|
| "Although the 'threaded bore' is the center of the 'cylindrical' feature that is identified in the patent as a 'clamp' (A0226, col. 10, ll.33-34), the 'threaded bore' is also identified as a discrete structural feature (34).  (*See* A0219-20, Figs. 7, 8, 10.)"  (A0226, 10:36-28.) | "The clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system.  **In the embodiment shown, the clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34 (see FIG. 7) for receiving the ends 26 and 28 of the metal fabric to substantially prevent the wires from moving relative to one another.**  The threaded bore 34 is adapted to receive and engage a threaded distal end of a delivery device."  (A0226, 10:28-38.)  (A0219, Fig. 7.)[2] |

----

[2] The threaded clamp portions of Figures 7, 8, and 10 appear to be identical. (A0219-20.)

AGA compounds the problems with its claim construction argument by ignoring the other relevant portions of the specification that were relied upon by the district court. All of these portions refer to the clamp and the threaded bore as a part of a single unitary structure. (*See* A0226-27, 9:1-2 ("threaded clamp"); 9:12 ("threaded clamp"); 10:32-34 ("clamps 30 and 32 are generally cylindrical in shape and have a threaded bore 34 . . ."); 11:65-67 ("The threads on the clamp . . .").) Indeed, AGA itself cannot help but describe the clamp and threaded bore as a unitary structure throughout its opening brief. (*See* AGA Br. 11 ("the threaded bore of the clamp"), 12 ("one end of the clamp structure prevents the metal strands from fraying and the other end of the same structure uses the threaded bore"), 17 ("the clamp's threaded bore"), 20 ("structure called the 'clamp' in the '738 patent—of which the threaded bore is a part"), 25 ("[discussing] the clamp more broadly (of which the 'threaded bore' is a part)").)

In short, there is no support in the '738 patent for AGA's claim construction position. It was properly rejected by the district court. The corresponding structure of the "means for securing said device to a delivery system" is a "clamp having a threaded bore."

## 2. The specification identifies the clamp as necessary for securing the device to the delivery system.

AGA's second argument is that the "clamp" should be ignored because it is "unnecessary," "irrelevant," and "unrelated" to the function of securing the device

to the delivery system.  (AGA Br. 3, 4, 29, 36, 37.)  Again, AGA's argument

contradicts both the plain language of the '738 patent and the common sense point

that the surrounding structure of a negative space such as a "bore" (here, the

"clamp" described in the patent) is always a necessary structure.  The '738 patent

is unequivocal that the "clamp" is necessary structure.  Far from characterizing the

clamp as unnecessary, the patent specification repeatedly describes the "clamp" as

the exact structure that is "attach[ing]," "connect[ing]," and "coupl[ing]" the

device to the delivery system.  (A0223-26, 3:44-49, 4:66-5:3, 8:67-9:3, 10:29-38.)

The "threaded **clamp**" is "**attached** to the medical device" and then "deployed out

the distal end of the catheter."  (A0225-26, 8:67-9:3 (emphasis added).)  The

"**clamp**" is "**attached** to an outer end of each occluding member" and then

"**coupl[ed]** to the end of a guidewire or catheter for delivery."  (A0223-24, 4:66-

5:3 (emphasis added).)  The "**clamp**" "**allow[s] attachment** of the device to a

delivery device or guide wire" and "**connect[s]** the device to a delivery system."

(A0223, 3:43-49; A0226, 10:28-31 (emphasis added).)

    The specification also explains that the "clamps" secure the device to the

delivery system by (a) receiving the metal wires of the device into one end of the

threaded bore and (b) receiving the threaded distal end of the delivery system into

the other end of the threaded bore.  Column 10 provides the most complete

description of how the clamps play the central role in "serv[ing] to connect the

device to a delivery system":

> The clamps 30 and 32 tying together the wire strands at
> corresponding ends 26 and 28 also serve to connect the
> device to a delivery system. In the embodiment shown,
> the clamps 30 and 32 are generally cylindrical in shape
> and have a threaded bore 34 (see FIG. 7) for receiving
> the ends 26 and 28 of the metal fabric to substantially
> prevent the wires from moving relative to one another.
> The threaded bore 34 is adapted to receive and engage a
> threaded distal end of a delivery device.

(A0226, 10:28-38.) As this passage makes clear, the "clamp" is the critical

structure for securing the device to the delivery system because it "connect[s]" the

occluding member and the delivery system together by "receiving" the occluding

member on one side and "receiving" the delivery system on the other side. If the

clamp did not connect the occluding member and the delivery device together on

both sides, then the entire arrangement for securing the device and the delivery

system together would fall apart. AGA's own illustration shows how this would

happen:



(AGA Br. 12.)

In sum, contrary to AGA's arguments, the clamp is not an unnecessary or irrelevant structure. The specification could not be clearer that the clamp is the critical structure performing the function of "securing the device to a delivery system."[3]

### 3.   AGA previously admitted that the "clamp having a threaded bore" construction is "correct."

Finally, AGA's arguments on appeal contradict the admissions that AGA made during oral argument on summary judgment before the district court. (A3001-02, A3006-11, A3014.) During the summary judgment hearing, AGA's counsel repeatedly told the district court that its "clamp with a threaded bore" construction was "correct":

- AGA: What you decided [in the district court's *Markman* Order], Your Honor, is that you found that the patent linked the claimed function to the language in the specification, "the clamp with a threaded bore." You found that there was that linking, and there was. **And that finding we are not**

---

[3] The cases cited by AGA in its claim construction argument contradict the arguments AGA advances in this appeal. (AGA Br. 28.) The outcomes of the means-plus-function claim constructions in cases like *Chiuminatta*, *Wenger*, *Acormed*, and others were (of course) case-specific constructions based on the unique specifications of the particular patents-in-suit. Critically, however, all of those cases did exactly what the district court did in this case: they looked carefully at the specification to find the specific corresponding structure in the specification that is linked to the claimed function. *See, e.g.*, *Chiuminatta*, 145 F.3d at 1308 ("The specification clearly identifies the structure performing that function as the skid plate, which is the only embodiment of the 'support surface' disclosed in the specification . . . . The [corresponding] structure of the skid plate is broadly described in the specification of the '499 patent as follows: a generally rectangular strip of metal having rounded ends 26 and 28 between which is a flat piece 30."). That is exactly the claim construction process that AGA tries to avoid on appeal.

**attacking. We're not saying you should change that. That is correct. No prejudice has occurred by that finding. It is correct, as far as it goes.** And it goes so far as to say that there was this linking. (A3001-02 (emphasis added).)

- AGA: [I]n this context, where it's a means-plus-function clause, what we have to do is look at what it is that is the function that is being specified, and then we go to the specification as you did. And you said, what does the specification teach is the structure that does that? **And it taught this thing called a clamp with a threaded bore.** (A3006-07 (emphasis added).)

- THE COURT: [During *Markman*,] we had a big fight about whether the clamp was part of the means. And right or wrong, I know you probably think wrong, but –

  AGA: **No, I don't think it's wrong. You did not commit an error and there's no prejudice** because you have not drilled down yet to look at the infringement issue. (A30008 (emphasis added).)

- AGA: **As I said, I don't think there's any error with what you did [with claim construction]. What you said, and it's correct, is that the patent linked that function of means for securing to a clamp with a threaded bore. That's absolutely correct.** (A3010-11 (emphasis added).)

- AGA: **[I]n this patent where they are claiming means for securing, and you said there's a clamp with a threaded bore, which is correct, we go to this patent, and we find the structure in this patent that is the clamp with a threaded bore. That's the structure. It's nothing else.** (A3014.)

AGA's counsel was right. In the words of AGA's counsel: the patent "taught this thing called a clamp with a threaded bore." The patent "linked the function of means for securing to a clamp with a threaded bore." "That's the structure. It's nothing else." As AGA's own counsel admitted, the district court's analysis and ultimate claim construction decision were "absolutely correct."

34

Under the doctrine of waiver, this Court should hold AGA to its repeated concessions in open court about the correctness of the district court's claim construction. *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1341 (Fed. Cir. 2005) ("LizardTech agreed to the district court's construction at the time, and it cannot now argue against that claim construction simply because it resulted in an adverse ruling on summary judgment."); *Conoco Inc. v. Energy & Evtl. Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006) ("[A] party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below."). In any event, AGA's counsel confirmed what is indisputable from a review of the specification of the '738 patent: the proper construction of the "means for securing said device to the delivery system" is a "clamp having a threaded bore."

## II.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT BASED ON AGA'S FAILURE TO PROFFER EVIDENCE THAT THE CLAIMED "MEANS FOR SECURING SAID DEVICE TO A DELIVERY SYSTEM" IS PRESENT IN THE ACCUSED DEVICE.

### A.   Bhattacharya's Expert Report Violated a Number of Baseline Rules for Proving Patent Infringement.

The district court was also correct when it found that the Bhattacharya report failed to create a genuine issue of material fact on infringement because Bhattacharya failed to analyze the "clamp having a threaded bore" structure.

The legal requirements for determining patent infringement are well-established and unbending.  To begin, at the most basic level, determining infringement requires a two-step analysis: "First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process." *Absolute Software*, 659 F.3d at 1129 (quotation omitted).  To survive summary judgment in patent cases, therefore, the plaintiff must compare the "properly construed" claim to the "accused device." *Id.*

Second, a plaintiff cannot survive summary judgment by offering an infringement analysis based on an incorrect claim construction.  "Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial.  No party may contradict the court's construction to a jury." *Exergen*, 575 F.3d at 1321.  Thus, when an expert's opinions on equivalency "rest on an incorrect claim interpretation . . . they do not create a factual dispute." *Wiener v. NEC Elecs., Inc.*, 102 F.3d 534, 542 (Fed. Cir. 1996).

Third, in determining infringement, no claim limitation may be "ignored as insignificant or immaterial in determining infringement." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1373-74 (Fed. Cir. 2002).  In the means-plus-function context, this means that the "overall structure that corresponds to the claimed

function" must be compared to the accused structure, and the plaintiff cannot "deconstruct[] or pars[e]" the overall structure in trying to prove infringement. *Odetics*, 185 F.3d at 1268.

Finally, it is especially important in the context of means-plus-function claims that the plaintiff provides a "clear identification" of both the claimed structure and its equivalent in the accused devices in order to survive summary judgment. *Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1187 (Fed. Cir. 2009). As this Court has explained, "a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court." *Id.* at 1183.

Here, Bhattacharya's infringement report violated each of these baseline legal rules for determining patent infringement. In direct contradiction of the two-step infringement inquiry required by this Court, Bhattacharya failed to apply the "clamp having a threaded bore" construction that had been adjudicated by the district court during the *Markman* process. Instead, as he expressly admitted in his expert report, Bhattacharya's infringement analysis was based on the same "threaded bore" claim construction that the district court had already rejected: "[T]he **threaded bore serves as the means** for securing the device to the delivery system." (A1884, ¶ 63 (emphasis added).)

37

Given Bhattacharya's decision to ignore the claim construction ruling and the "clamp" aspect of the "clamp having a threaded bore," the district court had no choice but to grant summary judgment. Bhattacharya failed to compare "the claim as properly construed" to the "accused device." *Absolute Software,* 659 F.3d at 1129. He "contradict[ed] the court's [claim] construction" and improperly "rested" his opinion "on an incorrect claim interpretation." *Exergen,* 575 F.3d at 1321; *Wiener*, 102 F.3d at 542. He improperly "parse[d]" the overall structure of the "clamp with a threaded bore" to focus only on the "threaded bore," thereby "ignoring as insignificant" a claim limitation. *Odetics,* 185 F.3d at 1268; *TechSearch*, 286 F.3d at 1373-74. And by failing to apply the proper claim construction, he made it impossible for his report to set forth "in sufficient detail for the court . . . [the] features of the accused product [that] would support a finding of infringement under the claim construction adopted by the court." *Intellectual Science*, 589 F.3d at 1183.

Certainly, it is understandable that Bhattacharya was unable provide an opinion of infringement based on the district court's "clamp having a threaded bore" construction. The "clamp with a threaded bore" disclosed in the '738 patent is a discrete cylindrical piece of hardware, with a threaded bore inside, that secures the device to the delivery system by connecting the occluder on one side of the clamp and the delivery system on the other side of the clamp:



This overall structure is a night and day difference from the single helically-wound nitinol wire frame in the accused HELEX device, which includes three eyelets through which a delivery mandrel slides along the length of the device:



(A2949, Fig. 11(b) (highlighting added).)  But the appropriate way for a patent plaintiff to deal with an unfavorable claim construction in the district court that makes infringement impossible is **not** to file an expert infringement report that fails to apply the court's claim construction.  It is to concede non-infringement

under that claim construction and either withdraw the lawsuit or move on to the next stage of the legal process.  AGA chose the wrong path.

### C.    AGA's Arguments in Defense of the Bhattacharya Report Are Incorrect.

AGA makes two arguments regarding the sufficiency of the Bhattacharya report as proof of infringement.  First, AGA asserts that Bhattacharya adequately addressed the "clamp having a threaded bore" limitation.  Second, AGA alternatively asserts that Bhattacharya was not required to address the "clamp having a threaded bore" limitation.  AGA is wrong on both counts.

### 1.    Bhattacharya did not apply the "clamp having a threaded bore" construction to his infringement analysis.

A paragraph-by-paragraph examination of Dr. Bhattacharya's report shows that he did not apply the "clamp having a threaded bore" construction in his infringement analysis.  Indeed, AGA itself concedes in its appeal brief that "[t]he body of the expert's analysis had few references to the clamp."  (AGA Br. 38.)  Instead, with only cursory references to the correct construction, Bhattacharya ignored the full structure of the "clamp having a threaded bore" and focused his analysis on explaining how the accused HELEX device included a structural equivalent of the "threaded bore" aspect of the claimed structure.  The full text of Bhattacharya's opinion on structural equivalence is provided below.  Here is a summary of the paragraphs:

| Paragraph | Problem |
|-----------|---------|
| ¶ 61 | Conclusory |
| ¶ 62 | Analysis limited to "threaded bore" |
| ¶ 63 | Analysis limited to "threaded bore" |
| ¶ 64 | Analysis limited to "threaded bore" |
| ¶ 65 | Analysis limited to "threaded bore" |
| ¶ 66 | Analysis limited to "threaded bore" |
| ¶ 67 | Analysis limited to "threaded bore" |
| ¶ 68 | Analysis limited to "threaded bore" |
| ¶ 69 | Conclusory |

The phrase "clamp having a threaded bore" appears exactly twice in the section of Bhattacharya's report addressing structural equivalence—in brief, single sentence introduction and conclusion paragraphs surrounding his analysis:

> 61. It is further my opinion that the distal eyelet of the HELEX® device is equivalent to the "clamp having a threaded bore" structure shown in the '738 patent for performing the function of "securing the device to the delivery system."

> 69. In summary, it is my opinion that the distal eyelet is on the distal end of the HELEX® device, and the distal eyelet is equivalent to the structure "clamp having a threaded bore" for purposes of performing the function of "securing the device to the delivery system", and performs that identical function.

(A1883, ¶ 61; A1888, ¶ 69.)

These two sentences are not an infringement analysis and contain no factual basis—they only purport to summarize Bhattacharya's opinion. As a matter of law, such unsupported conclusions cannot create a genuine issue of material fact. *Intellectual Science*, 589 F.3d. at 1185 ("Dr. Michalson's affidavit supplied only

the statement that the structures in the accused devices 'perform the same function as the claimed 'data transmitting means' (*i.e.,* transmitting to the host computer), in the same way (*i.e.,* through a time division multiplexed structure) to achieve the same result (*i.e.,* transmitted information sets).' That conclusory statement is insufficient."); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

Between the introduction and conclusion, Bhattacharya offered a seven-paragraph analysis on structural equivalence in which the phrase "clamp having a threaded bore" was never mentioned. (A1883-88, ¶¶ 62-68) Instead, Bhattacharya focused entirely on the "threaded bore in the device" because, in his opinion, "**the threaded bore serves as the means for securing the device to the delivery system**." (A1884, ¶ 63 (emphasis added).) This "opinion" directly contradicts the district court's claim construction and adversely affects every paragraph of his equivalence analysis. Notably, to illustrate the corresponding structure, Bhattacharya did not use the patent figures or diagrams similar to those used by AGA in this appeal, which show the entire clamp structure:



Instead, his report showed only a portion of the threaded bore, with no attempt to

depict the overall clamp structure:

> 62. The device and the delivery system shown in the patent function as follows. The **threaded bore in the device** and the threaded shaft of the delivery system is conceptually shown in Figure 13(a).



> **Figure 13 a:** Conceptual representation of the device with a **threaded bore** mechanically engaging the shaft of the delivery system.

> 63. The device's threaded bore consists of threads machined into a hole (bore) and **the threaded bore serves as the means for securing the device to the delivery system**. The threads in the bore mechanically engage the thread on the shaft of the delivery system. The smallest diameter of the device's threaded bore has a smaller diameter than the largest diameter at the top of the treads in the delivery system. This provides a mechanical interference between the annular surfaces (a) of the delivery system threads and the bore threads and

> prevents the delivery system from passing freely through the threaded bore. Further, this attachment is designed to be removable: rotating the shaft of the delivery system with respect to the threaded bore causes the shaft threads to slide out of the bore thereby removing the mechanical interference.

(A1883-85, ¶¶ 62-63 (emphasis added).)

Turning to the accused HELEX device in paragraphs 64 through 67 of his report, Bhattacharya did not attempt to compare the HELEX device to the claimed "clamp having a threaded bore." Instead, he opined that a portion of the HELEX structure performs the same function as "the **threaded bore** shown in the '738 patent." (A1885-87, ¶¶ 64, 66 (emphasis added).) And again, his diagrams focused on only one small aspect of the complex securing mechanism in the HELEX device (a single loop of the device's distal eyelet), which he opined was a structural equivalent to a **threaded bore**:

> 64. **The distal eyelet of the HELEX® device performs the same function of securing the device to the delivery system as the threaded bore shown in the '738 patent.** In the Gore system, the diameter of the opening in the distal eyelet is smaller than the outer dimension of the flared enlarged portion of the mandrel. This provides a mechanical interface between the annular surfaces (a) of the eyelet and the flared enlarged portion and prevents the delivery system from passing freely through the eyelet.



**Figure 13 b**: Conceptual representation of the distal eyelet of the HELEX® device engaging the flared mandrel of the delivery system.

65. This arrangement provides a mechanical interference and it is designed to be removable: pulling the mandrel made of a plastic material causes the flare to deform thereby removing the mechanical interference.

66. **The distal eyelet of the HELEX® device performs the same function of securing the device to the delivery system as the threaded bore shown in the '738 patent in substantially the same way to accomplish substantially the same result.** As shown in Fig. 13 (a) and (b) the way both systems operate is to use mechanical interference between a face of each of the delivery system and the device to hold the delivery system to the device.



67. The result is the same for both systems because the mechanical interference secures the device to the delivery system until the operator desires to separate them by twisting the shaft out of the bore in the structure shown in the patent or by popping the flared mandrel out of the eyelet in the Gore device. Any differences between the two systems are insubstantial particularly taken in the context of the invention and/or the skill of people in this art.

(A1885-88, ¶¶ 64-67 (emphasis added).)

This is not a comparison of "the claim as properly construed . . . to the accused device," as required to prove infringement. *Absolute Software*, 659 F.3d at 1129. This is a comparison of two diagrams that Bhattacharya created, which do not accurately depict either the claimed invention or the HELEX device.

Finally, in discussing interchangeability in paragraph 68 of his report, Bhattacharya again failed to consider the "clamp having a threaded bore," referring only to "the screw out system shown in the '738 patent." (A1888.) As this Court has explained, interchangeability "is certainly not dispositive" and "does not obviate the statutory mandate to compare the accused structure to the corresponding structure." *Chiuminatta*, 145 F.3d at 1309-10 (citation omitted). And interchangeability certainly cannot apply where, as here, the wrong structures are being compared.

> 68. Furthermore, persons of ordinary skill in this art would have known of the interchangeability of the screw out system shown in the '738 patent and the pop out system used by Gore. The interchangeability of these two mechanical interference fits was well known by a person of ordinary skill in the art at the time of the invention. Indeed, screw-off and pop-off bottle tops are interchangeable and both are well known to secure the cap to the bottle via a mechanical interference. Further, an alternative to a threaded screw-like device with a deformable interference device was well known in the art at the time of the invention. (See e.g. WLG00247692 (Fig. 11d).) The interchangeability is virtually as simple as the interchangeability of a nail and a screw, particularly when taken in the context of the invention.



(A1888, ¶ 68.)

That is the end of his analysis.  Bhattacharya did not offer any comparison between the accused HELEX device and the claimed "clamp having a threaded bore."  The only substantive analysis in his report was limited to the threaded bore.  His references to the clamp structure at the beginning and end of his analysis were nothing more than conclusory.

As discussed above, expert opinions based on an incorrect claim construction do not meet the required two-step test for infringement and "do not create a factual dispute."  *Wiener*, 102 F.3d at 542.  Thus, the district court properly granted summary judgment of noninfringement.[4]

---

[4] The cases cited by AGA as examples of adequate expert testimony are inapposite to this case.  Indeed, they highlight the failures in the Bhattacharya report.  Most important, in *Hearing Components*, *IMS Tech*, and *Al-Site*, the expert witnesses who offered opinions on infringement applied the corresponding structure that was identified by the court.  Unlike Bhattacharya, none of the experts offered independent opinions ignoring or narrowing the corresponding structure.

### 2. AGA was required to present evidence of infringement of all limitations, including the "clamp having a threaded bore" structure.

AGA's second argument is essentially a repackaging of its incorrect claim construction argument. AGA argues that Bhattacharya was not required to consider the complete "clamp having a threaded bore" structure because the "clamp" performs no aspect of the securing function. (AGA Br. 34-39.) This argument fails for several reasons.

First, this Court has expressly rejected AGA's argument that it is appropriate in the infringement analysis to deconstruct the corresponding structure of "clamp having a threaded bore" into smaller parts such as the "threaded bore." As this Court stated in *Odetics, Inc. v. Storage Tech. Corp.*, "[t]he appropriate degree of specificity is provided by the statute itself; the relevant structure is that which corresponds to the claimed function." 185 F.3d at 1268. Thus, the "claim limitation is the overall structure that corresponds to the claimed function" and any further "deconstruction or parsing is incorrect." *Id.*

Second, AGA is wrong that the "clamp" performs no aspect of the securing function. This is the same argument that AGA made regarding claim construction, and it fails for the same reasons discussed in Section I.A.2 above. The "clamp" is a specific, discrete structure that the patent repeatedly describes as "attach[ing]," "connect[ing]," and "coupl[ing]" the device to the delivery system. (A0223-26,

3:44-49 ("clamps . . . allow attachment of the device to a delivery device"), 4:66-5:3 ("the clamps are adapted for coupling to the end of a guidewire or catheter for delivery"), 8:67-9:3 ("threaded clamp attached to the medical device"), 10:29-38 ("clamps 30 and 30 . . . also serve to connect the device to a delivery system").) The specification provides no support for AGA's assertion that "securing the device to a delivery system" is performed by the threaded bore alone.

Third, AGA is wrong about the main case it cites in its brief, *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324 (Fed. Cir. 2006). Misreading *Applied Medical*, AGA asserts that any component of a corresponding structure that performs "additional" unclaimed functions—in addition to the claimed function—should be ignored in the infringement analysis. (AGA Br. 35-36 ("[U]nder *Applied Medical Resources*, the clamping feature (whether structure or function) is irrelevant to the securing function.").) But that is not the law. *Applied Medical* held only that the manner in which an unclaimed **function** is performed is not relevant to the infringement analysis. *See Applied Medical*, 448 F.3d at 1334 ("[T]he inquiry should be restricted to the way in which the structure performs the properly-defined function and should not be influenced by the manner in which the structure performs other, extraneous functions."). *Applied Medical* did not—and could not—hold that any structure that performs an unclaimed function should be ignored, including those structures that also perform the

50

claimed function.  Any such ruling would contravene the fundamental rule that governs the quid pro quo of means-plus-function claims: "[if] a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof."  *Mettler-Toledo*, 671 F.3d at 1296.  In this case, where the specification identifies the "clamp having a threaded bore" as the corresponding structure, *Applied Medical* teaches only that unclaimed **functions** performed by the clamp—for example, preventing the woven metal wires of the occlusion member from unraveling—should not be considered in the infringement analysis.  *Applied Medical* in no way suggests that the "clamp" **structure** can be ignored when it is also specifically disclosed in the patent specification as the corresponding structure for performing the function of "securing said device to the delivery system."  AGA cannot so easily evade the bargain it made with the patent office and the public when it chose to take advantage of means-plus-function claiming under § 112, ¶ 6.

## CONCLUSION

For the reasons stated herein, Gore respectfully requests that the Court affirm the district court's construction of the "means for securing said device to a delivery system" in the asserted claims and affirm summary judgment of noninfringement.

Dated:   February 5, 2014                  Respectfully submitted,


                                           */s/  James W. Poradek*
                                           James W. Poradek
                                           Katherine S. Razavi
                                           FAEGRE BAKER DANIELS LLP
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, MN  55402-3901
                                           Telephone:  612-766-7000
                                           Facsimile:  612-766-1600
                                           E-mail: james.poradek@faegrebd.com
                                           E-mail: kate.razavi@faegrebd.com

                                           Jared B. Briant
                                           Leslie B. Prill
                                           FAEGRE BAKER DANIELS LLP
                                           3200 Wells Fargo Center
                                           1700 Lincoln Street
                                           Denver, CO 80203
                                           Telephone:  303-607-3500
                                           Facsimile:  303-607-3600
                                           E-mail: jared.briant@faegrebd.com
                                           E-mail: leslie.prill@faegrebd.com

                                           **Counsel for Defendant-Appellee, W. L.
                                           Gore & Associates, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2014, a true and correct copy of the

foregoing document was served by ECF upon the following counsel of record:

| | |
|---|---|
| Gregory G. Garre | gregory.garre@lw.com |
| Maximilian A. Grant | max.grant@lw.com |
| Matthew J. Moore | matthew.moore@lw.com |
| Gabriel K. Bell | gabriel.bell@lw.com |
| R.J. Zayed | zayed.rj@dorsey.com |
| Alan G. Carlson | acarlson@carlsoncaspers.com |
| Tara C. Norgard | tnorgard@carlsoncaspers.com |
| J. Derek Vandenburgh | dvandenburgh@carlsoncaspers.com |

Dated:  February 5, 2014

*/s/  James W. Poradek*
James W. Poradek

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), Fed. R. App. P., I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B), Fed. R. App. P. This brief contains 11,002 words, calculated by the word processing system used in its preparation.

Dated: February 5, 2014

/s/ *James W. Poradek*
James W. Poradek